U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2021 MAR -8  PM 1: 17

CLERK

BY_____
DEPUTY CLERK

THOMAS COLE,                )
                                 )
     Plaintiff,           )
                                 )
        v.                 )     Case No. 2:18-cv-00220
                                 )
FOXMAR, INC. d/b/a EDUCATION    )
AND TRAINING RESOURCES,      )
                                 )
     Defendant.        )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 58)

Plaintiff Thomas Cole brings this action against Defendant Foxmar Inc. d/b/a Education and Training Resources ("Defendant" or "ETR") seeking damages arising out of Defendant's termination of his employment on July 27, 2018. In his Fourth Amended Complaint, Plaintiff alleges claims of wrongful termination in violation of the Vermont Occupational Safety and Health Act ("VOSHA"), 21 V.S.A. §§ 201-32; wrongful termination in violation of the Vermont Earned Sick Time Act ("VESTA"), 21 V.S.A. §§ 481-87; and promissory estoppel.

On May 18, 2020, Defendant moved for summary judgment on Plaintiff's claims. Plaintiff opposed the motion on June 30, 2020 and Defendant replied on August 11, 2020. Plaintiff filed a sur-reply on September 8, 2020, at which time the court took the pending motion under advisement.

Plaintiff is represented by William Pettersen, Esq. Defendant is represented by Kevin L. Kite, Esq., Mara D. Afzali, Esq., Michael D. Billok, Esq., and Paul J. Buehler, III, Esq.

## I.     Whether the Court May Consider Exhibits Attached to Plaintiff's Statement of Facts.

As a preliminary matter, Defendant contends that the court should not consider the exhibits Plaintiff attaches to his motion because they are "unauthenticated and unsworn to[.]" (Doc. 68 at 6.) Under Fed. R. Civ. P. 56(c)(1):

> a party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

Fed. R. Civ. P. 56(c)(1).

While a party "may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence[,]" Fed. R. Civ. P. 56(c)(2) (emphasis supplied), this "do[es] not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex v. Catrett*, 477 U.S. 317, 324 (1986); *see also Lee v. Offshore Logistical Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (holding that evidence submitted to support or dispute a fact must be admissible but "the material may be presented in a form that would not, in itself, be admissible at trial."); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (noting that a court may consider "the content or substance of otherwise inadmissible materials where the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form."). Plaintiff's evidence can be presented in admissible form at trial as either party admissions or business records and therefore this evidence is properly before the court. *See* Fed. R. Evid. 801 and 803.

## II.    Undisputed Facts.

### A.     The Pre-Termination Events.

Defendant is a company that partners with the U.S. Department of Labor, Office of Job Corps and local Workforce Investment Boards for the management and operation of Job Corps Centers and customized workforce development programs that serve both youth and adults. On June 1, 2018, Defendant assumed management of the Northland Job

Corps Center ("NJCC") located at 100A MacDonough Drive, Vergennes, Vermont. Prior to Defendant's management of the NJCC, it was managed by Chugach Education Services, Inc. ("Chugach").

Plaintiff was hired as a Residential Counselor ("RC") in 2018 under Chugach's management and was rehired in that position when Defendant assumed management of the NJCC. As an RC, Plaintiff's duties consisted of overseeing dormitory life, interacting with students, and generally overseeing maintenance in the dormitories. Plaintiff worked "Second Shift" and reported to work at approximately 3:00 p.m. on his scheduled days and left between 12:00 – 1:00 a.m. Plaintiff's work schedule was posted each week. Upon arriving at NJCC each day, Plaintiff reported to the Department of Independent Living ("DIL"), where he met with his supervisor, Angela Mobley, and the other RCs working Second Shift in a group meeting referred to as "In-Briefing." Thereafter, RCs would receive a dormitory assignment and proceed to their designated location. The RCs were responsible for supervising their assigned dormitory for the remainder of their shift. While on duty, the RCs were charged with coordinating and assisting the students in cleaning their dormitory. Each dormitory was provided with cleaning supplies, including sanitizer. When RCs noticed that a cleaning supply item was out of stock, they were instructed to send in an order form to the purchasing department to re-stock the item.

On July 23, 2018, Plaintiff reported to In-Briefing at around 3:00 p.m. as scheduled. When Ms. Mobley arrived at In-Briefing that day, she assigned Plaintiff to Dorm 24, which was not his typical dormitory assignment. Plaintiff reported to that location and waited with the students for Ms. Mobley to arrive for rounds. When Ms. Mobley arrived, the students informed Plaintiff and Ms. Mobley that the dormitory was out of sanitizer and had been for an unknown period of time. When asked to clean the dormitory, some of the students told Plaintiff that they could not do so because they were sick.

The following day, on July 24, 2018, Plaintiff called Center Director Alicia Grangent and asked to meet with her. They met that morning in Ms. Grangent's office and Plaintiff expressed his concerns regarding the lack of cleaning supplies in the

3

dormitory and his belief that staff members were being required to work while sick if they could not find replacements for their shift. Ms. Grangent acknowledged Plaintiff's concerns and told him she would look into the matter. After meeting with Plaintiff, Ms. Grangent notified Ms. Mobley and Bernadette Brookes, the Human Resources Director for NJCC, about her meeting with Plaintiff and the substance of his concerns. Ms. Grangent testified in her deposition that she did not inform Howard Harmon, the Executive Vice President and Chief Operating Officer of ETR, of Plaintiff's complaints:

> Q. So you're saying that you didn't raise those complaints to Howard [Harmon] at that time, and you didn't raise those complaints to Howard prior to [Plaintiff]'s termination?
>
> A. No, it's only a couple of hours, ah, in between there; there was no need to.

(Doc. 58-6 at 130.)

That same day, when Plaintiff returned to NJCC for his shift at approximately 3:00 p.m., he saw RC Paige Howell and RC Tori Ramon. RC Howell was curled up on the couch, while RC Ramon was sitting next to her. Plaintiff believed that both RCs were sick and decided to leave work. On his way to Ms. Grangent's office, Plaintiff encountered Ms. Grangent on campus. They briefly spoke and Plaintiff informed her that he was leaving. Plaintiff then stopped by Ms. Grangent's office and spoke to her assistant, Brian Lacharite to let Mr. Lacharite know he was leaving and would not be returning to work that day.

On Wednesday, July 25, 2018, Plaintiff called Defendant's corporate office and left a message on an answering machine stating that he was "experiencing difficulties on the Northlands campus and was asking for some assistance." (Doc. 58-3 at 273.) On the morning of Friday, July 27, 2018, Plaintiff drafted a letter to Ms. Brookes and at approximately 9:34 a.m., emailed it to Ms. Brookes's assistant Mari Trybendis and to Ms. Grangent. Plaintiff's letter stated:

> I met with Northlands Center Director on Tuesday morning, 7/24/2018 to express my concerns of oversight on health and wellness related practices within the Department of Independent Living.

In particular, I cited a willingness on the part of the department lead to retain staff members for shift coverage after acknowledging that the staff member had symptoms of diarrhea, vomiting and dizziness.

I also spoke of reassignment the previous evening to a dorm that could be determined unsanitary. An address of the students by the Independent Living Coordinator during accountability resulted in the disclosure that there were no cleaning chemicals on site, to include sanitizer, and it was undetermined as to the length of time that had passed in the absence of proper sanitizing.

Not feeling well, I departed prior to my shift and again alerted the Center Director to my earlier concerns and to the presence of a staff member laying in the fetal position on a lounge couch at the time of their arrival for in briefing.

I believe these conditions present an unnecessary risk to my personal health and wellness and negatively impact the over all confidence in my role and presence within the Department of Independent living.

I am asking for the consideration of a job reassignment out of the Department of Independent Living.

(Doc. 65-3 at 1.)

## B.   Decision to Terminate Plaintiff.

On Thursday, July 26, 2018, Ms. Brookes spoke with Ms. Mobley and told her that Plaintiff had not contacted her regarding leaving his shift on Tuesday, July 24, 2018. Ms. Brookes asked Ms. Mobley when Plaintiff was scheduled to work that week, and Ms. Mobley responded that Plaintiff missed his scheduled shifts on Wednesday and Thursday, July 25-26, 2018 and that he abandoned his shift on Tuesday, July 24, 2018. Ms. Mobley indicated that because of these absences, she believed that Plaintiff should be terminated. Ms. Brookes asked Ms. Mobley to provide her with a written statement to substantiate the request to discipline Plaintiff. Ms. Grangent testified in deposition that Ms. Brookes approached her that same day and asked her to sign a termination packet for Plaintiff. Ms. Grangent refused to sign the termination packet, telling Ms. Brookes that "my name will not be a part of that because it's not been three days[.]" (Doc. 58-6 at 84.) Ms. Grangent advised Ms. Brookes and Ms. Mobley that Plaintiff could not be terminated for job

5

abandonment because he had not yet missed three days of work, but that "they were proceeding with the disciplinary fact regardless." *Id.* at 89.

On Friday, July 27, 2018 at approximately 10:08 a.m., Ms. Brookes received an email from Ms. Mobley regarding Plaintiff's conduct over the course of the preceding week which stated:

> On Monday, July 23, 2018, I learned that Tom [Cole] reported to work but left the center before brief-in at 3:00 p.m. I was just coming from meeting with new staff when I entered the building to begin brief-in. I learned that Tom was in the building before I arrived for brief-in and said to prime staff that he was leaving. Tom did not wait to talk to me about whatever issue that he was having on that day. I called Tom['s] cellular but he did not answer his phone. I have not heard from Tom. Tom was scheduled to work Monday, 7/23/18, Tuesday, 7/24/18, Wednesday, 7/25/18, Saturday, 7/28/18, and Sunday, 7/29/18. Tom has not reached out to me to say that he was not coming to work or to say he needs personal leave time because of any personal issues that he needs to work out. All staff are on a 90 day probation period and he has not fulfilled his probationary period. He abandon[ed] his job and I had to quickly fill his shift to provide safety and security for students during the prime shift.

(Doc. 58-14 at 3.) Defendant admits that one of the dates listed in the email is incorrect and that Plaintiff worked his shift on Monday, July 23, 2018.

At approximately 10:07 a.m.[1] Ms. Brookes forwarded this email to Mr. Harmon, Ms. Mobley, Ms. Grangent, and Scott Dunham, ETR's Vice President, Center Operations & Support. Ms. Brookes also provided her own observations regarding Plaintiff's conduct:

> My prevailing thought on this is purely professional:
>
> 1.      Tom's prior behavior under Chugach counts for Northlands as it relates to interfacing with the students as they are still here. The recommended write up has been discarded due to the contract change but the behavior is still a running commentary for Northlands Job Corps.
>
> 2.      There seemed to have been a trigger of some sort on Tuesday with Mr. Cole['s] interpersonal engagement with the ailing staff member but unless he communicates this, I will only be guessing and that doesn't

---

[1] It is unclear why the time stamp on Ms. Mobley's original email is one minute later than the time stamp on Ms. Brookes's email forwarding that communication.

absolve Mr. Cole from his overarching duties of being professional and
mirroring behavior that is expected.

3.      His failure to communicate with his supervisor Mrs. Mobley even
after Tuesday is unacceptable and unprofessional. This is not exemplary
behavior. We can accommodate a day of being distressed followed by a
discussion but days and then a simple blurb requesting re-assignment is
hardly what constitutes building life skills with our student[s]. Mr. Cole had
indeed left both of his scheduled shifts unmanned and failed to live up to
the expectations Northlands holds for its residential counselors.

My recommendation is that Mr. Cole is given firm direction on his request
for re-assignment should that be granted and that it also involves correction
action for his continued employment with Northlands Job Corps.

*Id.*

Following Ms. Brookes's email, Ms. Grangent sent an email with the subject line

"FW: Reassignment Request" to the same group at approximately 10:41 a.m. which

stated:

I leave around noon; however this is not the first time that Tom has
abandoned his job post. Once under Chugach and now under ETR. I realize
that the first one doesn't count. However, he has created a hardship by
leaving the center without coverage. We terminate students under the UE
for the exact same thing (job abandonment). Not only did he give staff the
opportunity to address the issue he doesn't even work the same dormitory
as the ill employee that was sent home. Creating another vacancy.

Just my thoughts on the matter, I will leave it to you both to make a
decision on what you want to do; if he stays he needs a write-up and I'm
not in approval of moving him to another area.

*Id.* at 4. Mr. Harmon responded by email at 11:21 a.m., stating "[a]t this point, I would

prefer to release, but I will let Alicia [Grangent] and Bernadette [Brookes] make the final

call." *Id.* at 2. Ms. Brookes responded at 12:12 p.m. that her "recommendation and that of

the Center Director is to sever ties effective today Friday, June 27, 2018." *Id.*

On the afternoon of July 27, 2018, Ms. Brookes met with Plaintiff to inform him

of his termination. During that meeting, Plaintiff asked Ms. Brookes if she had read his

letter and she responded that she was unaware of his letter. Ms. Brookes later mailed

Plaintiff a copy of his termination letter.

On August 20, 2018, Plaintiff contacted Mr. Harmon to notify him that he believed there were errors in his termination letter regarding his schedule. Mr. Harmon told Plaintiff that he was an at-will employee and was terminated during his probationary period, and that accordingly, Defendant was not required to provide him with any reason for his termination.

## C.      Defendant's Attendance and Safety Policies.

When Defendant assumed management of NJCC, all employees, including Plaintiff, attended a one-week orientation program. As part of orientation, each employee was provided with a copy of the employee handbook (the "Handbook") and introduced to the leaders of each department. Defendant's Handbook contains several policies describing Defendant's expectations regarding employee's attendance and other conduct. These policies include, among other things, an Employee Conduct and Accountability policy, which lists job abandonment as a "dischargeable offense," and an Attendance and Punctuality policy which notes that, "[a]bsence from work for three (3) consecutive days without notifying your manager or the Human Resources Department will be considered a voluntary resignation and job abandonment." (Doc. 58-13 at 28, 40.) The Handbook further states:

> All parties involved will adhere to ETR's Core Values in all that we do. This not only means that the expectation is that we will all operate in a safe environment, both physically and mentally, that will allow an open dialogue that leads to individuals taking accountability to proactively act in good faith to demonstrate a commitment to integrity and respect that allows growth for both the individual, the Center, and the Company. This expectation to adhere to the Core Values governs your actions and your communications, as well as, your inactions and decisions not to communicate. You have the distinct privilege and responsibility to speak up when things are found out of compliance.

*Id.* at 8. The Handbook's "Safety and Security" policy states in relevant part:

> Compliance with safety and security policies and procedures will help us all in maintaining a safe Center environment that will support the high level of programming we offer. In addition, employees must call attention to conditions or situations which threaten the safety and security of others by contacting appropriate Center management representatives.

*Id.* at 50.

## D. Plaintiff's Deposition Testimony.

Plaintiff testified as follows regarding his termination:

Q. So, sitting here today, do you feel that you were fired from ETR because you complained that one of the dorms didn't have any sanitizer?

A. I don't know that.

Q. I'm asking if you – what your, what your understanding is.

A. My understanding is, that there has been an error in explaining why I was terminated. I disagree with job abandonment. That is my only, that is my only claim and understanding.

Q. Do you know what VOSHA is or the Vermont Occupation Health and Safety—

A. No, --

Q. -- Act?

A. -- I do not.

Q. Do you know what VESTA is, --

A. No.

Q. – the Vermont Earned Sick Time Act?

A. No.

Q. Do you -- again , just to clarify sitting here today, is it your understanding that you believe you were fired because Tori Ramo[n] was required to find a replacement before she went home sick?

A. I don't know why I was fired. I, I – that's why I'm asking for those to look into it. I just – here because I disagree with their statement under the terms of which I left there, that's not job abandonment.

(Doc. 58-3 at 258-59.)

Plaintiff admitted that he didn't "know any particular laws [regarding workplace safety] or anything else beyond" his familiarity with safety regulations promulgated by the National Restaurant Association but that he believed that "there was something on the books" that the National Restaurant Association was "using to inform their decision to prevent" sick persons from coming to work. *Id.* at 284.

When asked whether he believed that his complaints were "noncompliance issues[,]" Plaintiff testified that "he wasn't certain about noncompliance" *id.* at 281, but that he believed that the lack of sanitizer in the dormitory "would have been an issue" and that "[i]t was something that was not optional. It was not under discretion[.]" *Id.* at 282. With regard to employees being required to work while sick, Plaintiff stated that he believed that "if you have bodily fluid, you are expressing; producing, that you should, you know, not be in a – in a common community kind of situation for reasons of just health and welfare of those around you." *Id.* at 283. The following colloquy ensued:

> Q. Did you feel that what you were reporting was a safety concern for the welfare of the public?
>
> A. I – I believe that that was not a – that any time a situation where somebody is expressing bodily fluids, that that presents a hazard to anyone in their immediate contact, yes.
>
> Q. How about the sanitizer issue, did you think that that was an issue of safety for the welfare of the students?
>
> A. Yes, it was important to maintain. There were 40-some-odd students there, that was a large dorm of young men with – who were all learning personal care practices that were not well honed. That was part of the thing they were there to learn, personal care, and we didn't have, you know, the sanitizer to support that practice.

*Id.* at 285.

## III.   Disputed Facts.

While it is undisputed that Plaintiff made complaints to Ms. Grangent on July 14, 2018, the parties disagree regarding whether Plaintiff requested reassignment to a different position during that meeting. Defendant asserts that Plaintiff made a reassignment request but does not cite to any evidence supporting that claim.

Defendant characterizes it as improbable that Plaintiff reasonably believed he was complaining about public health and safety merely because the dorm he was supervising was out of sanitizer. Plaintiff counters that there were widespread and repeated concerns about the cleanliness of the dorms. He cites RC Howell's deposition testimony that "[t]he dorms were in . . . deplorable condition. They were really dirty. The students were made to clean them instead of a maintenance staff, and we often didn't have the resources to do

a very good job of it[.]" (Doc. 58-7 at 32.) She further testified that she and another employee "found mold in one of the dorms, and we were verbally reprimanded for making a report on it" *id.*, and that "counselors would complain at least every other day to Ms. Mobley or the next manager, Kyle Burditt, that there was a shortage of cleaning supplies." (Doc. 65-26 at 5.)

The parties also disagree regarding the events that took place at the beginning of Plaintiff's shift on Tuesday, July 24, 2018. Defendant asserts that when Plaintiff arrived for In-Briefing, RC Ramon and RC Howell were already present and RC Howell was curled up on the couch. Plaintiff did not speak to either of them. Plaintiff disputes this version of events and asserts that he observed "Paige Howell coming in and, you know, basically crawling into, into the fetal position on the couch and Tori [Ramon] as well" (Doc. 58-3 at 178) and that Ms. Ramon was sick and unable to participate in the In-Briefing. She indicated that she was "feeling dizzy and had things coming out both ends[,]" *id.* at 123, to which Ms. Mobley responded, "[y]ou people in Vermont need to take your medicine," *id.* at 127, and that thereafter he overheard Ms. Mobley tell Ms. Ramon, "[w]e need to find somebody to come in so that you can go home" which he perceived as a request that Ms. Ramon continue working until a replacement was found. *Id.* at 259. Ms. Grangent testified that Ms. Mobley had previously required staff members to find someone to replace them if they called in sick.

Based on Plaintiff's conduct, Defendant contends that NJCC management was uncertain of whether he intended to remain employed at NJCC.[2] After Plaintiff left NJCC on July 24, Defendant maintains that Ms. Brookes tried to contact Plaintiff several times over the course of July 24-26, 2018, including that she "called him three times on

---

[2] *See* Doc. 58-4 at 140 (Testimony of Ms. Brookes stating "A. I don't think that I meant it to be that instantaneously. But the explanation was what he had said. The point to the explanation was that he left and told the Center Director he was done, he couldn't continue. Q. But you at least realized he wasn't quitting; by the time you terminated him, you knew he wasn't quitting? A. Well, the day that we actually spoke I – I realized that based on the fact that he sent this letter that he was looking for reassignment as opposed to quitting.").

Thursday" and "on Wednesday afternoon after he left [her] office to find out what he wanted to see [her] about[.]" *Id.* at 33.

Plaintiff contends that Ms. Grangent knew that he "had left his shift; however [she] didn't believe he had quit nor did [she] inform anyone that he quit his job[.]" (Doc. 65-7 at 2, ¶ 10.) Plaintiff disputes that Ms. Brookes tried to contact him between July 24 and 26, citing cellular phone records indicating that he received only two calls from phone number (802) 877-0159, both of which occurred on Friday, July 27, 2018. (Doc. 58-8 at 6.) Plaintiff further points to Ms. Brookes's deposition testimony that her office number is the phone number that she would have used to call Plaintiff. *See* Doc. 58-4 at 33 ( "A. . . . It's 802-877-0159. That is my office number. Q. And that's the number that you would have called him on – A. Yes.").

The parties dispute whether, at the time of Plaintiff's termination, Ms. Brookes was aware of the letter he addressed to her and sent to Ms. Grangent and Ms. Trybendis on July 27, 2018. Defendant contends that Ms. Brookes only read the letter after Plaintiff had already met with her and been terminated. Defendant cites Ms. Brookes's deposition testimony that she "wasn't aware of [Plaintiff's] E-mail until the end of the day" and that it was not until around 5:00 p.m. that she "saw the letter attached." (Doc. 58-4 at 46-47.) Plaintiff responds that Ms. Brookes received the letter via email at 9:56 a.m. and that she directly referenced the letter as "a simple blurb requesting re-assignment" in an email she sent at 10:07 a.m. on Friday, prior to Plaintiff's termination. (Doc. 58-14 at 3.)

Ms. Brookes testified that she did not know about Plaintiff's health complaints until October of 2018, but Ms. Grangent testified that she told Ms. Brookes of Plaintiff's complaints on Tuesday, July 24, 2018, and RC Howell testified that Ms. Brookes called her on that same day and informed her "that [Plaintiff] had gone down there and complained about me being sick, and while I was at work if I was sick, and she informed me that I should go home." (Doc. 58-7 at 16.) Ms. Trybendis testified that the week after Plaintiff's termination, Ms. Brookes informed her that he had been terminated and "mentioned that he had not shown up for work" and "brought up about the employee

12

being sick and that there were no cleaning supplies, that [Plaintiff] had complained about that." (Doc. 58-5 at 22.)

Defendant contends that Plaintiff was scheduled to work on July 25 and 26, 2018 based on statements made by Ms. Mobley to Ms. Brookes that "he had missed a shift for three days . . . From Tuesday till Thursday." (Doc. 58-4 at 36.) Plaintiff maintains that these were his scheduled days off and cites a document titled "WEEKLY SCHEDULE" for the Week of 07/23 through 07/29 which shows that "Tom" was scheduled to work on July 23, 24, 27, 28, and 29. (Doc. 65-12 at 3.) The document does not show "Tom" scheduled for July 25 or 26. *Id.* While Plaintiff admits that he left his shift early on Tuesday, July 24, 2018, he contends that this does not amount to job abandonment and would not have been counted as an absence. Plaintiff points to Ms. Grangent's deposition testimony wherein she stated that she "counted Tuesday as a show because he showed up to work" and that "[t]echnically if at three o'clock . . . even if [he] worked a half an hour, he still worked that day is how I looked at that. I'm pretty black and white on if they showed up to work, they made the travel down to Vergennes, they came to work that day." (Doc. 58-6 at 80.) Defendant admits that Plaintiff told both Ms. Grangent and her assistant Mr. Lacharite that he was leaving.

The parties dispute whether Defendant knew of the date errors in Ms. Mobley's email prior to Plaintiff's termination. Defendant points to deposition testimony of Ms. Brookes that she did not realize her mistakes until she was "[r]eviewing the termination document" after Plaintiff was terminated. (Doc. 58-4 at 90.) In contrast, Plaintiff contends that Ms. Brookes, Ms. Mobley, and Mr. Harmon all knew on Friday prior to Plaintiff's termination that he had not missed work on Monday or Tuesday as alleged. Plaintiff points to an email sent by Ms. Brookes to Ms. Mobley at 12:26 p.m. on Friday, July 27, 2018 which included Mr. Harmon and Ms. Trybendis. The email states "I will need you to approve his punches through Tuesday. I am afraid that he will be paid for Tuesday as he showed and will be given Wednesday as Vacation combine with today[.]" (Doc. 65-14 at 1.) Ms. Grangent testified that she informed Ms. Mobley prior to

Plaintiff's termination that he had not abandoned his job on Tuesday and had not yet missed three days of work:

> Q. And do you recall if – I'm just a little unclear, so I'll ask it a different way. Do you recall whether on that phone call, at least with Ms. Mobley, did you express concern that Mr. Cole had not abandoned his job?
>
> A. I did.
>
> Q. And what was the basis of your concern that you communicated to Ms. Mobley?
>
> A. The basis of my concern was that he hasn't missed enough time to be considered job abandonment.
>
> Q. Did you at that time communicate to her that he had not missed Tuesday, to your understanding?
>
> A. I did[.]

(Doc. 58-6 at 170-71.)

Ms. Grangent further testified that she told Ms. Brookes on Thursday that "this isn't going to happen. It's not even been three days" and that "my name will not be a part of [terminating Plaintiff] because it's not been three days, because I was counting Tuesday as his actual day that he came to work." *Id.* at 84. She notified Ms. Brookes that Ms. Mobley "wasn't able to confirm [Plaintiff's] days off because everything was in such a mess as far as days off" and that Plaintiff therefore "cannot be terminated[.]" *Id.* at 167-68.

Defendant maintains that Mr. Harmon made the final decision to terminate Plaintiff and cites deposition testimony of Ms. Grangent that she believed that Mr. Harmon and Ms. Brookes had "a little conversation in her office . . . and, ah, strategized or did whatever they did, and then came to the conclusion that [terminating Plaintiff] is what they were going to do and made a decision." *Id.* at 91. Ms. Brookes also testified that "[t]he final decision was made with leadership" including "Howard Harmon, Alicia Grangent, [and] Bernadette Brookes" via "a series of E-mails that were passed along, back and forth." (Doc. 58-4 at 61-62.) Plaintiff disputes whether Mr. Harmon made the final decision, pointing to Ms. Brookes's deposition testimony that "because Ms. Mobley was very strong-minded about it . . . I literally let the team make the decision and allow

her – give her – rest it in her case. And I just followed along with it as the HR
Manager[.]" *Id.* at 60. He further cites evidence that Ms. Mobley had "a tyrant
mentality," was "an absolute tyrant" and told RC staff they should not go over her head
with complaints or there would be consequences. (Doc. 58-6 at 41-42.) Plaintiff further
points to Ms. Brookes's testimony that "the decision was made unilaterally by everyone,
leadership, to sever ties with Mr. Cole[,]" *id.* at 59, and proffers an email sent by Ms.
Grangent to Ms. Mobley and Ms. Brookes in which Ms. Grangent stated that she
"[would] leave it to you both to make a decision on what you want to do[.]" (Doc. 65-15
at 1.)

Defendant alleges that Ms. Mobley had a subjective belief that Plaintiff was
scheduled to work on July 25 and 26, 2018, but cites no evidence in support that
contention. Plaintiff contends that Ms. Mobley knew that Plaintiff was not scheduled to
work on those days because, as Ms. Grangent testified at her deposition "it was [Ms.
Mobley's] responsibility" to draft schedules for the residential counselors. (Doc. 58-6 at
162.) She further stated that she asked Ms. Mobley which days Plaintiff was scheduled to
have off that week, that Ms. Mobley did not have an answer, and that she "referred that
information back to Bernadette [Brookes]" as an explanation for "why [Plaintiff] cannot
be terminated[.]" *Id.* at 167-68.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the
governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015)
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is
'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the
nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

The court "constru[es] the evidence in the light most favorable to the nonmoving
party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*,

700 F.3d 635, 640 (2d Cir. 2012). The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

"Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact" but to "determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [she] is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255.

In this case, although certain material facts are disputed, they do not preclude summary judgment if the moving party can establish that regardless of how that factual issue is resolved, the party that has the burden of proof at trial has not proffered admissible evidence in support of each essential element of its claim. *See Catrett*, 477 U.S. at 322 (holding summary judgment is mandated against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case"); *see also El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) (holding that "a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial") (internal quotation marks and citation omitted).

### B.     Whether Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claims under VOSHA and VESTA (Counts I and II).

VOSHA provides in relevant part that:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself, herself, or others of any right afforded by this chapter.

21 V.S.A. § 231(a). Although VOSHA is "patterned after the federal [Occupational Safety and Health Act ("OSHA"),]" *Green Mountain Power Corp. v. Comm'r of Lab. & Indus.*, 383 A.2d 1046 (Vt. 1978), VOSHA provides for a private right of action for any aggrieved employee, 21 V.S.A. § 232, while OSHA does not. *See Donovan v. Occupational Safety & Health Rev. Comm'n*, 713 F.2d 918, 925 (2d Cir. 1983) ("Under OSHA, employees do not have a private right of action."); *see also George v. Aztec Rental Ctr., Inc.*, 763 F.2d 184, 186 (5th Cir. 1985) ("We therefore hold that there is no private cause of action under federal law for a private employer's retaliatory discharge of an employee contrary to section 11(c)" of OSHA).

VESTA specifically prohibits an employer from "requir[ing] an employee to find a replacement for absences, including absences for professional diagnostic, preventive, routine, or therapeutic health care." 21 V.S.A. § 483(g). VESTA incorporates the following anti-retaliation provision set forth in 21 V.S.A. § 397:

> (a) An employer shall not discharge or in any other manner retaliate against an employee because:
>
> > (1) the employee lodged a complaint of a violation of this subchapter;
> >
> > (2) the employee has cooperated with the Commissioner in an investigation of a violation of this subchapter; or

17

>>>(3) the employer believes that the employee may lodge a complaint
>>>or cooperate in an investigation of a violation of this subchapter.

>>(b) Any person aggrieved by a violation of this section may bring an action
>>in the Civil Division of the Superior Court seeking compensatory and
>>punitive damages or equitable relief, including restraint of prohibited acts,
>>restitution of wages or benefits, reinstatement, costs, reasonable attorney's
>>fees, and other appropriate relief.

21 V.S.A. § 483(l) ("The provisions against retaliation set forth in section 397 of this title shall apply to this subchapter.").

In *Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408 (Vt. 2001), the Vermont Supreme Court held that in order to withstand summary judgment, a plaintiff alleging retaliation must establish four elements of a prima facie case: (1) the plaintiff employee was engaged in a protected activity; (2) the defendant employer knew of that activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action. *Id.* at 417-18. If a plaintiff establishes a prima facie case, the defendant must proffer a legitimate, nondiscriminatory reason for its actions. *Id.* at 418. If the defendant sustains this burden, the plaintiff must prove by a preponderance of the evidence either that the purported reason was a pretext for retaliation or that the defendant had mixed motives one of which was retaliatory and was a but-for cause its decision. In a retaliation claim, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Robertson v. Mylan Laboratories, Inc.*, 2004 VT 15, ¶ 18, 176 Vt. 356, 364, 848 A.2d 310, 319 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

"At the prima facie case stage, the plaintiff's burden is a relatively light one." *Beckmann v. Edson Hill Manor, Inc.*, 764 A.2d 1220, 1222 (Vt. 2000) (adopting the identical analytical framework set forth in *Mellin* for Vermont Fair Employment Practices Act ("FEPA") claims and observing that the framework is derived from the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Carpenter v. Cent. Vt. Med. Ctr.*, 743 A.2d 592, 595 (Vt. 1999) (holding "[p]laintiff's burden of proof in the prima facie case is minimal" and "[t]he

Court of Appeals for the Second Circuit has repeatedly called it 'de minimis'") (internal citations omitted).

Defendant does not dispute that it knew of Plaintiff's complaints about cleaning supplies and employees being required to work while sick and that Plaintiff suffered an adverse employment action. It contends that Plaintiff was not engaged in a protected activity and that, even if he was, Plaintiff has not established a causal connection between his protected activity and his termination.

### 1.    Whether Plaintiff Engaged in Protected Activity.

VOSHA prohibits retaliation against an employee who is exercising "any right afforded by this chapter." 21 V.S.A. § 231(a). VESTA also contains an anti-retaliation provision against an employee who lodges a VESTA violation complaint. *See* 21 V.S.A. § 483(l) (incorporating the provision against retaliation set forth in section 21 V.S.A. § 397). This court has predicted "that the Vermont Supreme Court will interpret VOSHA as protecting from retaliation employees who make verbal workplace safety complaints to an employer[.]" *Boule*, 2013 WL 711937, at *20. "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (internal quotation marks and alteration omitted).

Defendant asserts that Plaintiff's complaints to Ms. Grangent about the lack of cleaning supplies in Dorm 24 and his belief that employees were being required to find their own replacements or work while sick are not protected activities because Plaintiff did not have a subjective belief that Defendant was committing a violation of VESTA. Defendant points to Plaintiff's deposition testimony that, when asked whether he believed his complaints were noncompliance issues, "[he] wasn't certain about noncompliance." (Doc. 58-3 at 281.) Plaintiff also admitted that he didn't "know any particular laws [regarding workplace safety] or anything else beyond" his familiarity with safety regulations promulgated by the National Restaurant Association. *Id.* at 284.

Plaintiff responds that he also testified that "certainly I think [the lack of sanitizer] would have been an issue" and that "[i]t was something that was not optional. It was not under discretion[.]" *Id.* at 282. Plaintiff further testified that "if you have bodily fluid, you are expressing; producing, that you should, you know, not be in a – in a common community kind of a situation for reasons of just health and welfare of those around you." *Id.* at 283. When asked whether he felt that what he was reporting was "an issue of safety[,]" Plaintiff responded "[y]es" regarding both his complaint about sick employees and his complaint about the lack of sanitizer. *See id.* at 285.

An employee need not know the specific law being violated to engage in protected activity for a retaliation claim. *See Rodriguez v. AmericanWest Bank*, 2017 WL 6549913, at *3 (C.D. Cal. Sept. 20, 2017) (finding that "[i]t is enough . . . that the employee's stated concerns at least approximate the basic elements of a legitimate claim of law-breaking."); *Breaux v. Rosemont Realty*, 2018 WL 3235416, at *12 (W.D. La. July 2, 2018) ("An employee is not required to know specifically which law is being violated as long as the employee acts in good faith and reasonably believes there is a violation"). For retaliation claims, the "relevant question is whether Plaintiff had a good-faith belief that [the actual working conditions] created a hazardous safety . . . condition." *Niedziejko v. Delaware & Hudson Ry. Co.*, 2019 WL 1386047, at *37 (N.D.N.Y. Mar. 27, 2019). As a result, while Plaintiff admits that he did not know at the time that he was complaining of violations of VOSHA and VESTA, this is not "fatal to his claim." (Doc. 58-18 at 23.) Based on Plaintiff's deposition testimony, a reasonable juror could find that Plaintiff believed in good faith that he was reporting workplace health and safety issues and was therefore engaged in protected activity. *See Donovan v. Com. Sewing, Inc.*, 562 F. Supp. 548, 552 (D. Conn. 1982) (holding that "a complaint made to an employer about safety and health problems constitutes protected activity" under OSHA).

## 2.   Whether Plaintiff Has Established a Causal Connection.

Defendant argues that Plaintiff has failed to establish a causal connection between his protected activity and his termination because Ms. Brookes testified that she "wasn't aware" of Plaintiff's letter which reiterated his concerns and requested reassignment until

after his termination. (Doc. 58-4 at 46.) Defendant further maintains that Mr. Harmon was "the ultimate decisionmaker" with regard to Plaintiff's termination and that Mr. Harmon was unaware of Plaintiff's alleged protected activity when he decided to terminate him. (Doc. 58-18 at 24.) Defendant cites Ms. Grangent's deposition testimony that she did not raise Plaintiff's complaints to Mr. Harmon prior to Plaintiff's termination.[3] Defendant further argues that Plaintiff's alleged job abandonment is an intervening cause that breaks any causal connection between the protected activity and his termination.

Plaintiff responds that the three-day gap between his initial complaints and his termination satisfies the temporal requirement and it is a contested issue of fact whether Ms. Brookes knew of his complaints because Ms. Grangent notified Ms. Brookes and Ms. Mobley about those complaints on Tuesday, July 24, 2018, Ms. Brookes spoke to RC Howell regarding his complaints on that same day, and Ms. Brookes sent an email at 10:08 a.m. on Friday, July 27, 2018 which purportedly references his letter reiterating those complaints as "a simple blurb requesting re-assignment[.]" (Doc. 58-14 at 3.) Plaintiff also points to Ms. Grangent's deposition testimony that when she met with Ms. Brookes and Ms. Mobley on July 24, "the talk of the termination had already progressed out of [Ms. Mobley's] mouth." (Doc. 58-6 at 79-80.) He cites Ms. Brookes's deposition testimony that "because Ms. Mobley was very strong-minded about it . . . I literally let the team make the decision and allow her – give her – rest it in her case" and that "the decision was made unilaterally by everyone, leadership, to sever ties with Mr. Cole." (Doc. 58-4 at 59, 60.) Finally, Plaintiff contends that even if Mr. Harmon was the sole decisionmaker, there is circumstantial evidence that he knew of Plaintiff's complaints.

"[A] close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia*, 313 F.3d at 720; *see also Mellin*, 790 A.2d at 418 (holding that "[p]laintiff may

---

[3] *See* Doc. 58-6 at 130 ("Q. So you're saying that you didn't raise those complaints to Howard [Harmon] at that time, and you didn't raise those complaints to Howard prior to Tom's termination? A. No, it's only a couple of hours . . . in between there; there was no need to").

establish the required causation indirectly through the timing of her protected activity and [defendant's] alleged retaliatory actions"). Here, it is undisputed that Plaintiff was terminated three days after he made his initial complaint to Ms. Grangent, two days after he had called Defendant's corporate office, and on the same day that he sent a letter reiterating those complaints to Ms. Brookes. Plaintiff has therefore established a close temporal proximity between his health and safety complaints and his termination.

Although, "[a]n intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference[,]" *Joseph v. Marco Polo Network, Inc.*, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010), there is a disputed issue of material fact as to whether Plaintiff abandoned his job. Plaintiff argues that he provided notice in advance of leaving his shift on Tuesday, July 24, 2018, and was not scheduled to work on Wednesday or Thursday, July 25 and 26, 2018. He notes that Ms. Grangent testified that he did not abandon his job and refused to sign his termination letter on that basis.

Defendant's further argument that Mr. Harmon was the ultimate decisionmaker and did not know of Plaintiff's complaints does not alter the conclusion that summary judgment is inappropriate because while "lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection," a jury "can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities[.]" *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013) (holding that "[t]o the extent that decisionmaker knowledge is relevant in establishing causation, that knowledge may be satisfied by demonstrating that the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity *acts pursuant to encouragement by [another]* (who has knowledge) to disfavor the plaintiff") (internal quotation marks and citation omitted). Consequently, even if Defendant can establish that Mr. Harmon did not have knowledge of Plaintiff's alleged protected activity, there remains a genuine dispute of material fact as to whether Mr.

Harmon was the ultimate decisionmaker. Examining the evidence in the light most favorable to Plaintiff, he has satisfied his de minimis burden to establish a causal connection between his protected activity and his termination.

### 3. Whether Defendant had a Legitimate, Non-Retaliatory Reason for Termination and Whether Plaintiff has Established Evidence of Pretext.

Because Plaintiff has established a prima facie case of retaliation, Defendant must proffer a legitimate, non-retaliatory reason for Plaintiff's termination. Defendant characterizes Plaintiff's conduct on the days of July 24-27, 2018 as "job abandonment" as defined in the ETR Handbook which characterizes that act as a "[d]ischargeable offense[.]" (Doc. 58-13 at 39-40.) Although it is disputed whether Plaintiff abandoned his job, at this stage "it is not our task . . . to assess the credibility of [the] witnesses; nor is it our role to determine whether [defendant's] explanation of its action is convincing. Instead, we ask whether defendant has introduced evidence that, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason." *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (internal quotation marks and citations omitted). Because job abandonment constitutes a dischargeable offense, Defendant has satisfied its burden, shifting the burden to Plaintiff to proffer admissible evidence "that the [defendant's] reasons for [its] actions are a pretext for [retaliation]." *Mellin*, 790 A.2d at 418.

A plaintiff bringing a retaliation claim must show that "retaliation was a but-for cause of the adverse action . . . [h]owever, but-for causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-56 (2d Cir. 2013) (footnote omitted); *see also Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 22, 200 Vt. 125, 138, 129 A.3d 108, 118 (holding that plaintiff "must adduce enough evidence . . . so that a rational fact finder can conclude that the adverse job action was more probably than not caused by [retaliation]"). "A plaintiff can carry this burden 'by demonstrating weaknesses, implausibilities,

inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.'" *Gauthier*, 2015 VT at ¶ 22 (quoting *Zann Kwan*, 737 F.3d at 846).

Plaintiff points to evidence that Defendant's proffered reason for Plaintiff's termination was based on false information and further evidence that Ms. Grangent, Ms. Brookes, and Ms. Mobley, who drafted the work schedules, knew it was false. He cites evidence that he was not scheduled to work on July 25-26 and Ms. Grangent's testimony that she "counted Tuesday as a show" and that "[plaintiff] ha[d]n't missed enough time to be considered job abandonment." (Doc. 58-6 at 80, 170-71.) Ms. Grangent also testified that Ms. Mobley "wasn't able to confirm [Plaintiff's] days off because everything was in such a mess as far as days off[,]" *id.* at 167, expressed her concern to Ms. Mobley and Ms. Brookes that Plaintiff had not abandoned his job, and was, for that reason, unwilling to sign Plaintiff's termination notice. Construing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff did not abandon his job and that Defendant's proffered reason for his termination was pretextual.

Plaintiff has also proffered evidence that Ms. Brookes and Ms. Mobley knew of his health and safety complaints prior to his termination and played a critical role in that decision. When this evidence is considered in conjunction with the close temporal proximity of Plaintiff's protected activity and his termination, whether retaliation in violation of VOSHA and VESTA was a but-for cause of Plaintiff's termination must be determined by a jury. *See Mellin*, 790 A.2d at 418 (reversing grant of summary judgment where the plaintiff proffered some evidence that a retaliatory motive contributed to the adverse employment action she suffered and where "a genuine issue for trial existed").

For the foregoing reasons, Defendant's motion for summary judgment with regard to Counts I and II is DENIED.

## C.   Whether Defendant is Entitled to Summary Judgment on Plaintiff's Promissory Estoppel Claim.

In Count III, Plaintiff asserts a claim of promissory estoppel, alleging that Defendant made representations that employees should voice safety concerns and promised not to terminate employees who did so. Under Vermont law, "even if an employee otherwise enjoys only at-will employment status, that employee may still be able to establish a claim for wrongful termination under a theory of promissory estoppel[.]" *Dillon v. Champion Jogbra, Inc.*, 819 A.2d 703, 709 (Vt. 2002). "Establishment of promissory estoppel requires (1) a promise on which the promisor reasonably expects the promisee to take action or forbearance of a substantial character; (2) the promise induced a definite and substantial action or forbearance; and (3) injustice can be avoided only through the enforcement of the promise." *Green Mountain Inv. Corp. v. Flaim*, 807 A.2d 461, 467 (Vt. 2002).

Defendant argues that Plaintiff's claim for promissory estoppel must be dismissed because it is duplicative of his VOSHA and VESTA retaliation claims and therefore preempted. The court agrees. "Under Vermont law, where a statute creates a right or remedy unknown at common law, the statutory remedy preempts a common law cause of action." *Decker v. Vt. Educ. Television, Inc.*, 13 F. Supp. 2d 569, 573 (D. Vt. 1998) (citing *Winney v. Ransom & Hastings, Inc.*, 542 A.2d 269, 270 (Vt. 1988)); *see also Thayer v. Herdt*, 586 A.2d 1122, 1126 (Vt. 1990) ("When a statute confers a remedy unknown to the common law, and prescribes the mode of enforcing it, that mode alone can be resorted to.") (citation and internal quotation marks omitted).

Because Plaintiff's claim that he was terminated in retaliation for reporting safety concerns is governed by VOSHA and VESTA which create statutory causes of action, any common law claim based on the same facts grounded on a different legal theory is preempted. *See Boule*, 2013 WL 711937, at *24 (holding that because an employee's "wrongful termination claim based on public policy is wholly duplicative of his VOSHA retaliation claim, it is preempted by the adequate statutory remedy set forth in VOSHA"); *see also Worthen v. Gaulin*, 2005 WL 8149976, at *4 (Vt. Super. Ct. Mar. 31, 2005)

(observing that, in enacting VOSHA, "the legislature intended to preempt common law retaliation actions regarding workplace safety"). Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for promissory estoppel is GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment. (Doc. 58.) Defendant's motion for summary judgment with regard to Plaintiff's claims for wrongful termination in violation of VOSHA and wrongful termination in violation of VESTA (Counts I and II) is DENIED. Defendant's motion for summary judgment on Plaintiff's claim for promissory estoppel (Count III) is GRANTED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___8th___ day of March, 2021.

Christina Reiss, Chief Judge
United States District Court