U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2022 MAR 22  AM 11: 26

CLERK

BY _____
DEPUTY CLERK

THOMAS COLE,                                )
                                            )
        Plaintiff,                          )
                                            )
        v.                                  )        Case No. 2:18-cv-00220
                                            )
FOXMAR, INC., d/b/a EDUCATION               )
AND TRAINING RESOURCES,                     )
                                            )
        Defendant.                          )

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN
THE ALTERNATIVE, A NEW TRIAL**
(Doc. 131)

Pending before the court is a renewed motion for judgment as a matter of law or,

in the alternative, motion for a new trial filed by Defendant Foxmar, Inc., d/b/a Education

and Training Resources. (Doc. 131.) Plaintiff Thomas Cole brought this suit against

Defendant seeking damages as a result of Defendant's termination of Plaintiff's

employment on July 27, 2018. The jury considered two claims: retaliation in violation of

the Vermont Occupational Safety and Health Act ("VOSHA"), 21 V.S.A. §§ 201-32, and

retaliation in violation of the Vermont Earned Sick Time Act ("VESTA"), 21 V.S.A.

§§ 481-87, and returned a verdict for Plaintiff on both claims. It awarded Plaintiff

$215,943 in compensatory damages, comprised of $55,305 in back pay, $85,638 in front

pay, and $75,000 in emotional distress damages. The jury also awarded Plaintiff $3

million in punitive damages, for total damages of $3,215,943. The court entered

judgment on the verdict on August 2, 2021.

Defendant filed the pending motion on August 27, 2021. Pursuant to a stipulated

briefing schedule, Plaintiff opposed the motion on October 29, 2021, and Defendant

replied on November 29, 2021. The court held oral argument on January 18, 2022, at

which time it took the pending motion under advisement.

Plaintiff is represented by William Pettersen, IV, Esq. Defendant is represented by Kevin L. Kite, Esq., Mara D. Afzali, Esq., Michael D. Billok, Esq., and Paul J. Buehler, III, Esq.

## I.    Factual and Procedural Background.

Defendant is a company that partners with the U.S. Department of Labor, Office of Job Corps, and local Workforce Investment Boards for the management and operation of Job Corps Centers and customized workforce development programs that serve both youth and adults. On June 1, 2018, Defendant assumed management of the Northland Job Corps Center ("NJCC") located at 100A MacDonough Drive, Vergennes, Vermont. Prior to Defendant's management of NJCC, it was managed by Chugach Education Services, Inc. ("Chugach").

Plaintiff was hired as a Residential Counselor ("RC") in 2018 under Chugach's management and was rehired in that position when Defendant assumed management of NJCC. As an RC, Plaintiff's duties included interacting with students and overseeing dormitory maintenance.

Defendant's employee handbook (the "Handbook") identifies job abandonment as a "[d]ischargeable [o]ffense" and contains an Attendance and Punctuality policy which notes that "[a]bsence from work for three (3) consecutive days without notifying your manager or the Human Resources Department will be considered a voluntary resignation and job abandonment." (Doc. 58-13 at 28, 40.) Although the Handbook includes an "accountability schedule" that distinguishes between minor, major, and dischargeable offenses, it also states that "[a]t management's discretion, any violation of policies or any conduct considered inappropriate or unsatisfactory may subject the offender to accountability action, up to and including losing your job." *Id.* at 38, 40 (italics omitted). The Handbook further states:

> Employees who do not have an individualized written employment contract or a collective bargaining agreement are employed at the will of the company. This means that you are free to quit at any time, for any reason, just as we are free to release you from employment at any time, for any

2

reason with or without notice or cause.

*Id.* at 20. Plaintiff did not have an express individualized employment contract and was not covered by a collaborative bargaining agreement.

In dismissing Plaintiff's claims for breach of contract and breach of implied covenant of good faith and fair dealing claim based on an alleged contract, the court held that he was an at-will employee as a matter of law and that the Handbook did not guarantee progressive discipline. *Cole v. Foxmar, Inc.*, 387 F. Supp. 3d 370, 386 (D. Vt. 2019).

On July 23, 2018, Plaintiff's supervisor, Angela Mobley, assigned him to Dorm 24, which was not his typical dormitory assignment. The students in Dorm 24 informed Plaintiff and Ms. Mobley that the dormitory was out of sanitizer and had been for an unknown period of time. When asked to clean the dormitory, some of the students told Plaintiff that they could not perform this task because they were sick. Plaintiff testified that cleaning supplies were often missing and RCs were forced to purchase them with their own money.

At trial, there was evidence that Defendant required employees to bring safety complaints only to their direct supervisor, which Howard Harmon, Defendant's Executive Vice President and Chief Operating Officer, testified was motivated in part by a desire to limit complaints to the United States Department of Labor (the "DOL"). Correspondingly, employees were discouraged from making complaints to the DOL, including with regard to an incident of a student with a weapon, substandard food quality, and mold in the dorms. There was also evidence that NJCC experienced problems in each of these sectors, and Mr. Harmon himself acknowledged that at the time Defendant took over NJCC, it was a "mess." (Tr. 645.)

On the morning of Tuesday, July 24, 2018, Plaintiff met with Alicia Grangent, NJCC's Center Director responsible for overseeing the NJCC campus and the highest-ranking on-site member of Defendant's staff. Plaintiff expressed his concerns about the failure to properly supply a dormitory with cleaning supplies. He also complained that RCs were not allowed to leave work when they were sick, placing students and other

3

employees at risk. At trial, he testified inconsistently regarding whether he discussed with Ms. Grangent the need for sick employees to find their own replacements. He stated that he overheard Ms. Mobley tell a sick RC that "[w]e will find somebody so that you can go home." (Tr. 152.) (internal quotation marks omitted). Plaintiff admitted that he had worked while he was sick in the past and did not believe it was a violation of the law.

Ms. Grangent notified Ms. Mobley and Bernadette Brookes, the Human Resources Director for NJCC, about her meeting with Plaintiff and the substance of his concerns. Ms. Grangent also claimed to have alerted Defendant's corporate officers. When Plaintiff returned to NJCC for his afternoon shift, he saw RC Paige Howell and another RC, both of whom were sick and one of whom was lying on a couch in a fetal position. Plaintiff also felt sick and decided to leave work. On his way to Ms. Grangent's office, Plaintiff encountered Ms. Grangent on campus. They spoke briefly, and Plaintiff informed her that he was leaving. When Ms. Grangent asked him to wait to discuss the matter further, he stated he needed to leave. Plaintiff then stopped by Ms. Grangent's office and spoke to her assistant, Brian Lacharite, to let Mr. Lacharite know he was leaving and would not be returning to work that day. Mr. Lacharite testified that on more than one occasion, Ms. Mobley informed staff to find their own replacements if they called out sick.

Plaintiff was not scheduled to work on Wednesday, July 25, 2018, or Thursday, July 26, 2018. On Wednesday, July 25, 2018, Plaintiff called Defendant's Human Resources Department, located at its corporate headquarters in Kentucky, and left a voicemail indicating that he was experiencing difficulties at NJCC and looking for assistance. He received no response to his voicemail. He also went to the NJCC campus to speak with Ms. Brookes. He was unable to speak to her but spoke to her assistant, Mari Trybendis, and explained he had safety concerns he wanted to share, including a lack of cleaning supplies and sick employees working.

On Thursday, Plaintiff called Defendant's corporate headquarters a second time and left a voicemail stating he was having difficulties at NJCC and was looking for assistance and direction. On the morning of Friday, July 27, 2018, Plaintiff drafted a letter to Ms. Brookes and at approximately 9:34 a.m. emailed it to Ms. Trybendis and to

4

Ms. Grangent. Plaintiff's letter stated:

> I met with Northlands Center Director on Tuesday morning, 7/24/2018 to express my concerns of oversight on health and wellness related practices within the Department of Independent Living.
>
> In particular, I cited a willingness on the part of the department lead to retain staff members for shift coverage after acknowledging that the staff member had symptoms of diarrhea, vomiting and dizziness.
>
> I also spoke of reassignment the previous evening to a dorm that could be determined unsanitary. An address of the students by the Independent Living Coordinator during accountability resulted in the disclosure that there were no cleaning chemicals on site, to include sanitizer, and it was undetermined as to the length of time that had passed in the absence of proper sanitizing.
>
> Not feeling well, I departed prior to my shift and again alerted the Center Director to my earlier concerns and to the presence of a staff member laying in the fetal position on a lounge couch at the time of their arrival for in briefing.
>
> I believe these conditions present an unnecessary risk to my personal health and wellness and negatively impact the over all confidence in my role and presence within the Department of Independent Living.
>
> I am asking for the consideration of a job reassignment out of the Department of Independent Living.

(Doc. 65-3 at 1.)

On Thursday, July 26, 2018, Ms. Brookes spoke with Ms. Mobley and told her that Plaintiff had not contacted her regarding leaving his shift on Tuesday, July 24, 2018. Ms. Brookes asked Ms. Mobley when Plaintiff was scheduled to work that week, and Ms. Mobley responded that Plaintiff missed his scheduled shifts on Wednesday and Thursday, July 25-26, 2018, and that he abandoned his shift on Tuesday, July 24, 2018. Because of these absences, Ms. Mobley stated she believed Plaintiff should be terminated. Ms. Grangent refused to approve Plaintiff's termination and advised Ms. Brookes and Ms. Mobley that Plaintiff could not be terminated for job abandonment because he had not yet missed three days of work.

On Friday, July 27, 2018, at approximately 10:07 a.m., Ms. Brookes emailed Mr. Harmon; Ms. Mobley; Ms. Grangent; and Scott Dunham, Defendant's Vice President,

5

Center Operations & Support, recommending Plaintiff be disciplined and reassigned. She included a description of Plaintiff's conduct over the course of the preceding week from Ms. Mobley in her email. Ms. Brookes referred to the fact that when Chugach operated the NJCC campus, Plaintiff had been reprimanded for leaving a shift early and for using inappropriate language with students. Ms. Brookes wrote that Plaintiff's "prior behavior under Chugach counts for [NJCC] as it relates to interfacing with the students as they are still here. The recommended write up has been discarded due to the contract change but the behavior is still a running commentary for [NJCC]." *Cole v. Foxmar, Inc.*, 2021 WL 5178822, at *4 (D. Vt. Mar. 8, 2021). Ms. Grangent replied suggesting discipline but not reassignment and stated that Plaintiff's job abandonment under Chugach "doesn't count." *Id.*

At 11:21 a.m., Mr. Harmon responded recommending Plaintiff's termination but deferring to Ms. Brookes and Ms. Grangent for the final decision. Ms. Brookes responded at 12:12 p.m. that it had been decided that Plaintiff should be terminated for both job abandonment and failing to report to work for three days.

In the afternoon of July 27, 2018, Ms. Brookes met with Plaintiff to inform him of his termination. During that meeting, Plaintiff asked Ms. Brookes if she had read his letter, and she responded that she was unaware of his letter. Defendant thereafter issued Plaintiff a termination notice dated July 27, 2018, which stated that Plaintiff was terminated because he did not report for his scheduled shifts on Monday, July 23; Tuesday, July 24; and Wednesday July 25, 2018. The termination notice was signed by Mr. Harmon, Ms. Mobley, and Ms. Brookes.

On August 20, 2018, Plaintiff contacted Mr. Harmon to notify him that there were errors in his termination letter regarding his schedule. Mr. Harmon told Plaintiff that he was an at-will employee and was terminated during his probationary period and that, for this reason, Defendant was not required to provide him with any reason for his termination.

Ms. Grangent and Ms. Trybendis both testified that NJCC employees who missed work for one day without notice were not terminated. In addition, Ms. Trybendis testified

6

that in at least two other cases, NJCC employees who had missed more than three consecutive days without notice were not terminated.

Plaintiff filed a complaint in Vermont Superior Court in November 2018, and Defendant removed the case to this court on December 10, 2018. Plaintiff alleged that the claimed reason for his termination was false and pretextual and that he was actually terminated because he complained to his supervisors regarding health and safety violations he witnessed. On May 16, 2019, upon Defendant's motion, the court dismissed Plaintiff's claims for wrongful termination in violation of public policy, breach of contract, and breach of implied covenant of good faith and fair dealing. On March 8, 2021, the court granted in part and denied in part Defendant's motion for summary judgment, dismissing Plaintiff's promissory estoppel claim but allowing his claims for retaliation under VOSHA and VESTA to proceed.

From July 26, 2021 to July 30, 2021, the court held a jury trial, at which Plaintiff, Mr. Lacharite, Ms. Grangent, Ms. Brookes, and Mr. Harmon testified. Ms. Howell and Ms. Trybendis were unavailable to testify, and portions of their deposition testimony were read into the record. Economist Richard Heaps, who testified for Plaintiff, and economist Charles Amodio, who testified for Defendant, opined as expert witnesses on the issues of front pay and back pay. After the close of evidence, Defendant moved for judgment as a matter of law, which the court denied. The jury returned a verdict for Plaintiff on both counts.

## II.   Conclusions of Law and Analysis.

### A.   Whether Defendant is Entitled to Judgment as a Matter of Law.

Defendant argues that it is entitled to judgment as a matter of law in its favor on each of Plaintiff's claims and on the issue of punitive damages. The court may grant a motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50. Under this standard, a verdict may be set aside

only where there is such a complete absence of evidence supporting the

7

> verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him.

*Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012) (internal quotation marks omitted) (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009)). The court "must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000)).

### 1. Whether Defendant is Entitled to Judgment as a Matter of Law as to Liability.

Defendant argues that Plaintiff's retaliation claims under VOSHA and VESTA fail as a matter of law. To establish a prima facie case of retaliation, a plaintiff must establish: (1) the plaintiff was engaged in a protected activity; (2) the defendant knew of that activity; (3) plaintiff suffered an adverse employment action; and (4) a causal connection exists between plaintiff's protected activity and the adverse employment action. *See Cole*, 2021 WL 5178822, at *10-11 (citing *Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408, 417-18 (Vt. 2001)). "If a plaintiff establishes a prima facie case, the defendant must proffer a legitimate, nondiscriminatory reason for its actions." *Id.* at 10 (citing *Mellin*, 790 A.2d at 418). "If the defendant sustains this burden, the plaintiff must prove by a preponderance of the evidence either that the purported reason was a pretext for retaliation or that the defendant had mixed motives one of which was retaliatory and was a but-for cause its decision." *Id.*

A plaintiff may prove pretext "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (quoting

*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination." *Id.* (citation omitted); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."). Temporal proximity alone is insufficient to establish pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("[W]ithout more, . . . temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). As Plaintiff points out, he presented evidence of temporal proximity; disparate treatment of similarly situated employees; and weaknesses, implausibilities, and contradictions in Defendant's proffered nondiscriminatory reasons for his termination coupled with evidence of a corporate culture of suppressing legitimate safety complaints.

While the Vermont Supreme Court has not addressed whether, under VOSHA or VESTA, it is sufficient if a complainant has a good faith, reasonable belief that the employer is committing a violation of the law, courts have repeatedly found this satisfies similar anti-retaliation laws. *See, e.g., Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (holding that, under the Americans with Disabilities Act, a plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful "so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law") (alteration in original); *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (holding that a plaintiff states a prima facie claim for retaliation under Title VII "so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law") (citation omitted); *cf. Gonzalez v. Metro-North Commuter R.R.*, 2020 WL 230115, at *5, *9-10

(S.D.N.Y. Jan. 15, 2020) (granting defendant summary judgment on plaintiff's retaliation claim where he lacked a good faith belief that the concerns he reported related to any unlawful activity by his former employer).

Defendant argues that no reasonable juror could conclude that Plaintiff engaged in a protected activity under VOSHA or VESTA because Plaintiff failed to establish a good faith, reasonable belief that a violation of VOSHA or VESTA had occurred. With regard to Plaintiff's VOSHA violation claims,[1] Defendant argues that a temporary lack of cleaning supplies is not a violation of the law and that Plaintiff's testimony that "any workplace has a legal violation, is breaking the law, if they are temporarily out of cleaning supplies[,]" (Tr. 265-66), is "patently absurd[.]" (Doc. 135 at 27.) Defendant asserts that the reasonableness of Plaintiff's belief that a violation occurred was undermined by his acknowledgment that cleaning supplies were available in other dorms and were provided to him when requested.

As for Plaintiff's VESTA claim, Defendant contends that Plaintiff testified that he only complained about working with sick co-workers, which is not a violation of VESTA,[2] and made no complaint about sick employees having to find their own replacements.[3] Although Ms. Grangent testified that Plaintiff mentioned to her "a piece about having to find a replacement," (Tr. 319), and Plaintiff overheard Ms. Mobley telling another RC she needed to find a replacement before she could go home on the day

---

[1] VOSHA includes numerous requirements relating to workplace health and safety, including requirements that an employer must not provide working conditions that are unsanitary, hazardous, or dangerous to the health or safety of its employees. 29 C.F.R. §§ 1925.1; 4.6. An employer must provide employees with safe and healthful working conditions at their workplace. 21 V.S.A. § 201. An employer must provide employees with working conditions that insofar as practicable do not result in the diminished health of an employee. *Id.* Finally, an employer must ensure all places of employment be kept clean to the extent that the nature of the work allows. 29 C.F.R. § 1910.141(a)(3)(i).

[2] An employee "may use earned sick time" if "ill or injured[,]" but this is not required. 21 V.S.A § 483(a).

[3] VESTA provides: "An employer shall not require an employee to find a replacement for absences, including absences for professional diagnostic, preventive, routine, or therapeutic health care." 21 V.S.A. § 483(g).

he left his shift early, Defendant asserts that Ms. Grangent's testimony was impeached to an extent that "no reasonable juror could credit her testimony." (Doc. 135 at 31.)

Defendant further argues that no reasonable juror could find that retaliation was a but-for cause of Plaintiff's dismissal because the only evidence that any supervisor was aware of his protected activity was Ms. Grangent's testimony, "and she was impeached at trial on this very point." *Id.* at 32 (emphasis omitted). Defendant claims that the decision-makers who terminated Plaintiff were unaware of the letter he sent prior to his termination and were also unaware of his call to corporate headquarters. Defendant further challenges the sufficiency of evidence of pretext, arguing that the irregularities and inconsistencies surrounding Plaintiff's termination were "understandable" and "reasonable[.]" *Id.* at 36.

Defendant contends "Ms. Grangent's testimony is essentially worthless" and "Plaintiff's testimony is worthy of no weight at all[,]" while the "overwhelming majority of the evidence presented at trial warranted a verdict in [Defendant's] favor." (Doc. 140 at 34-35.) Defendant's arguments all depend on a re-evaluation of the credibility of witnesses and require the court to conclude that certain witnesses must be discredited in whole or in part. It also asks the court to reweigh the evidence in the light most favorable to Defendant.

On a motion for judgment as a matter of law, the court "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Brady*, 531 F.3d at 133 (quoting *Caruolo*, 226 F.3d at 51). To do so would intrude on the jury's role and function. This is not a case in which there was a "complete absence of evidence supporting the verdict" or evidence so unworthy of credibility that "reasonable and fair minded" jurors could not have reached the same liability verdict. *Bucalo*, 691 F.3d at 127-28 (internal quotation marks omitted) (quoting *AMW Materials Testing*, 584 F.3d 456).

For the foregoing reasons, Defendant's motion for judgment as a matter of law as to liability is DENIED.

## 2.    Whether Defendant is Entitled to Judgment as a Matter of Law as to Punitive Damages.

Defendant argues that punitive damages are unavailable as a matter of law and the court erred in sending the issue of punitive damages to the jury. The jury was instructed that "[i]n this case, punitive damages pertain only to [P]laintiff's claim that [D]efendant had a policy of requiring sick employees to find their own replacements before they were allowed to leave work." (Tr. 903.) Defendant does not challenge the substance of the court's punitive damage instructions, only the fact that they were given.

"In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Under Vermont law, Plaintiff must prove two elements to be awarded punitive damages "(1) wrongful conduct that is outrageously reprehensible; and (2) malice." *Carpentier v. Tuthill*, 2013 VT 91, ¶ 12, 195 Vt. 52, 57, 86 A.3d 1006, 1011 (citing *Fly Fish Vt., Inc. v. Chapin Hill Ests., Inc.*, 2010 VT 33, ¶ 18, 187 Vt. 541, 996 A.2d 1167).

Defendant asserts that "the trial court must decide whether punitive damages are warranted as a matter of law before submitting the question to the jury[.]" (Doc. 135 at 38.) The Vermont Supreme Court has held that there must be "a showing that defendants acted with actual malice" before the issue of punitive damages may be submitted to a jury; however, the required showing is not that punitive damages are warranted as a matter of law. *Follo v. Florindo*, 2009 VT 11, ¶ 44, 185 Vt. 390, 411, 970 A.2d 1230, 1245. Instead, "if there is evidence which reasonably supports punitive damages, the trial court must submit the issue to the jury." *Lent v. Huntoon*, 470 A.2d 1162, 1171 (Vt. 1983).

Defendant contends its conduct was not outrageously reprehensible because forcing employees to find their own replacements is legal in thirty-four states without

paid sick leave laws[4] and pales in comparison to conduct the Vermont Supreme Court has found outrageously reprehensible.

This determination of whether wrongful conduct warrants punitive damages is fact-specific and must be:

> determined by reference to whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Shahi v. Madden*, 2008 VT 25, ¶ 26, 183 Vt. 320, 334, 949 A.2d 1022, 1034 (internal quotations and citations omitted).

Evidence was presented at trial that Defendant required sick employees to work until they found replacements, even though they worked closely with minor and young adult students entrusted into Defendant's care. In addition, there was evidence that Defendant discouraged employees from making complaints to the DOL about unsafe conditions or concerning incidents at NJCC.

A reasonable juror could infer from this evidence that Defendant had a pattern and practice of discouraging employees from reporting health and safety concerns and requiring employees to work while sick and find their own replacements, which put employees and students at risk. The question of whether this was "wrongful conduct that is outrageously reprehensible[,]" *Carpentier*, 2013 VT 91, ¶ 12, 195 Vt. at 57, 86 A.3d at 1011, was properly submitted to the jury, which found that it was.

Defendant argues that none of the individuals involved in Plaintiff's termination acted with malice, which is "defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Fly Fish Vt., Inc.*, 2010 VT 33, ¶ 18, 187 Vt. at 549, 996 A.2d at 1173. "[M]alice may arise from deliberate and outrageous conduct aimed at securing financial gain or some other advantage at another's expense, even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm

---

[4] This evidence was not introduced at trial.

another." *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 27, 185 Vt. 267, 279, 971 A.2d 627, 636.
A corporation may be held liable for punitive damages if the malicious act is "that of the
governing officers of the corporation or one lawfully exercising their authority, or,
if . . . that of a servant or agent of the corporation, it must be clearly shown that the
governing officers either directed the act, participated in it, or subsequently ratified it."
*Shortle v. Cent. Vt. Pub. Serv. Corp.*, 399 A.2d 517, 518 (Vt. 1979).

The Vermont Supreme Court has "incorporate[d] recklessness as a component of
malice" so that "punitive damages are not limited to intentional egregious torts only, but
can extend to egregious harm resulting from reckless conduct amounting to malice." *Fly
Fish Vt., Inc.*, 2010 VT 33, ¶ 25, 187 Vt. at 553-54, 996 A.2d at 1176-77. However,
"[t]hat defendants were in wi[l]lful violation of [the law] or indifferent to plaintiffs'
rights, or both, is not determinative of malice." *Id.* at ¶ 28, 187 Vt. at 555, 996 A.2d at
1177. "[T]he reckless malfeasance or nonfeasance and its attendant risk of harm must all
be more reprehensible than simply wrongful or illegal behavior." *Id.* at ¶ 25, 187 Vt. at
553, 996 A.2d at 1176. "Misconduct motivated by fraud, associated with traditional
notions of *crimen falsi* or moral turpitude or deliberately oppressive trespass are often
sustained as grounds for punitive damages" while "strict liability offenses, such as
regulatory violations without malice or consumer fraud without actual intent to deceive,
have not been deemed sufficient to warrant an exemplary award." *Id.* at ¶ 25 n.3, 187 Vt.
at 553 n.3, 996 A.2d at 1176 n.3 (collecting cases).

*Ainsworth v. Franklin Cnty. Cheese Corp.*, 592 A.2d 871 (Vt. 1991), is instructive.
There, the plaintiff argued that his employer had "fabricated grounds for termination
solely to deny plaintiff his severance allowance" and "did so only after plaintiff had
worked in good faith to finish up his work and turn over his position to a new manager."
*Id.* at 875. The employer argued this was insufficient to show malice, but the Vermont
Supreme Court disagreed, finding "[t]his is the type of conduct that has given rise to an
award of punitive damages in our prior cases" because it "'has the character of a willful
and wanton or fraudulent tort.'" *Id.* at 874 (emphasis omitted) (quoting *Glidden v.
Skinner*, 458 A.2d 1142, 1144 (Vt. 1983)) (citing *Appropriate Tech. Corp. v. Palma*, 508

A.2d 724, 727 (Vt. 1986)).[5] The *Ainsworth* court noted that "[m]alice may be inferred from the nature of defendant's conduct and the surrounding circumstances" and held that "the jury could find in this case that [the employer's] conduct showed a wanton disregard for plaintiff's rights and was done to oppress." *Id.* at 875. It concluded "[t]here was no error in submitting the punitive damage issue to the jury." *Id.*

Plaintiff's theory at trial was similar to that at issue in *Ainsworth*. He argued Defendant "fabricated grounds for [his] termination" in reckless disregard of his rights. *Id.* The grounds Defendant gave for terminating Plaintiff were demonstrably false, and although Defendant contended this was a mere mistake, Plaintiff claimed it was a deliberate and malicious falsehood intended to punish him for his safety complaints. He pointed out that although Ms. Brookes claimed to have called him several times, Defendant lacked phone records that supported this claim. In addition, the parties cross-designated portions of the deposition of Ms. Trybendis, wherein she testified that other employees who had missed three or more days of work were not terminated.

The master schedule and time records in Defendant's possession contradicted its stated reasons for termination. In addition, Defendant's former supervisory employee, Ms. Grangent, testified that she raised concerns that the stated grounds for Plaintiff's termination were false and alerted management to Plaintiff's safety complaints in a conference call with corporate officers, including Mr. Harmon, prior to Plaintiff's termination. While Mr. Harmon testified that he did not realize the termination notice had errors in it until a week after Plaintiff's termination, he also testified to having a telephone conversation prior to Plaintiff's termination about the need to pay Plaintiff for his work on Tuesday, although the termination notice stated he had missed work that day. The evidence at trial included an email received by Mr. Harmon prior to Plaintiff's

---

[5] In *Appropriate Tech. Corp. v. Palma*, a "company president knowingly misrepresented [the company's] finances [to an employee], and . . . such misrepresentation induced [the employee] to leave the corporation's employ[,]" which, in turn, allowed the company to avoid a payout to the employee under a stock agreement. 508 A.2d 724, 727 (Vt. 1986). The Vermont Supreme Court affirmed the lower court's finding that the misrepresentation was made "in bad faith and with evil intent" and demonstrated sufficient malice to support a punitive damages award. *Id.*

termination which showed that Plaintiff had worked on Monday and Tuesday. Ms. Grangent testified that she refused to sign the termination notice because it was false and claimed Defendant nonetheless knowingly authorized the termination to proceed.

A reasonable juror could "infer[] from the nature of [D]efendant's conduct and the surrounding circumstances" that Defendant "fabricated grounds for [Plaintiff's] termination" in retaliation for Plaintiff's VESTA complaints. *Ainsworth*, 592 A.2d at 875; *see also Williams v. Regus Mgmt. Grp. LLC*, 836 F. Supp. 2d 159, 174 (S.D.N.Y. 2011) ("The factfinder may disbelieve the defendant's explanation either because the facts underlying the explanation are false or because the explanation is weakened by inconsistencies or logical flaws."). The evidence further reasonably supported a conclusion that Mr. Harmon, a corporate officer, "either directed the act, participated in it, or subsequently ratified it." *Shortle*, 399 A.2d at 518. In turn, a reasonable juror could conclude that Defendant committed "a wi[l]lful violation of law in reckless disregard of [P]laintiff's rights" under VESTA, *Fly Fish Vt., Inc.*, at ¶ 29, 187 Vt. at 555, 996 A.2d at 1178, with misrepresentations that had "the character of fraud[.]" *Follo*, 2009 VT 11, ¶ 48, 185 Vt. at 413, 970 A.2d at 1246. This evidence was sufficient to support the jury's conclusion that Defendant acted with "bad motive [and] ill will" in terminating Plaintiff. *Fly Fish Vt., Inc.*, 2010 VT 33, ¶ 18, 187 Vt. at 549, 996 A.2d at 1173. The jurors were properly instructed regarding the legal standard for punitive damages and "are presumed to [have] follow[ed] [the court's] instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (internal quotation marks omitted) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Because there was "evidence which reasonably supports punitive damages," there was no error in submitting the issue to the jury. *Lent*, 470 A.2d at 1171. For this reason, Defendant's renewed motion for judgment as a matter of law as to punitive damages is DENIED.

### B.    Whether Defendant is Entitled to a New Trial.

Defendant contends that even if it is not entitled to judgment as a matter of law in its favor, it is entitled to a new trial. "It is well established that the trial judge enjoys

'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence[.]'" *Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012) (first alteration in original) (quoting *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 433 (1996)). "A district court may grant a Rule 59 motion—even if some evidence supports the verdict—if the court determines, 'in its independent judgment, [that] the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice.'" *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 128 (2d Cir. 2016) (quoting *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (alterations in original)).

### 1. Whether the Verdict as to Liability Was Against the Weight of the Evidence.

Defendant contends the jury's verdict as to the VOSHA and VESTA retaliation claims was against the weight of the evidence because Plaintiff's witnesses were not credible. In considering a motion for a new trial, "a trial judge should not be quick to revisit a jury's credibility determinations, and must proceed 'with caution and great restraint' when asked to do so." *Id.* at 128 (quoting *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012)). In this case, the credibility determinations by the jury were not so "seriously erroneous" that they resulted in a "miscarriage of justice." *Id.* (quoting *Nimely*, 414 F.3d at 392). The court therefore declines to exercise its discretion to order a new trial on this basis.

### 2. Whether the Presentation of Allegedly Inadmissible Evidence Warrants a New Trial.

Defendant argues that the jury was presented with inadmissible evidence from witnesses Ms. Howell and Ms. Grangent. Plaintiff introduced this evidence as admissions by a party opponent, pointing out that Fed. R. Evid. 801(d)(2)(D) does not require an employee to have speaking authority as a prerequisite to a party admission. *See* Advisory Committee's Notes on Fed. R. Evid. 801(d)(2)(D) ("Since few principals employ agents for the purpose of making damaging statements . . . [the rule] favors admitting statements related to a matter within the scope of the agency or employment."). Defendant nonetheless contends the evidence was irrelevant and unduly prejudicial.

To support a motion for a new trial, the introduction of evidence must have been

17

"a clear abuse of discretion" and "so clearly prejudicial to the outcome of the trial" that the court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Nimely*, 414 F.3d at 399 (quoting *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir. 1997)). The court must be "especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance." *Id.* at 400 (internal quotation marks omitted) (quoting *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000)).

Under Fed. R. Evid. 404(b), evidence of other crimes, wrongs, or acts are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" but "may be admissible for another purpose, such as proving motive, . . . intent, . . . plan, . . . [or] absence of mistake[.]" Fed. R. Evid. 404(b)(1)-(2). "The Second Circuit evaluates Rule 404(b) evidence under an 'inclusionary approach' and allows evidence 'for any purpose other than to show a defendant's . . . propensity.'" *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002) (citations omitted).

Ms. Howell testified that on one occasion she was asked to find her own replacement when she was absent due to illness for her autoimmune disease. She stated that she and other RCs raised complaints to Defendant regarding a lack of cleaning supplies and mold in the dorms. She claimed felt threatened by Ms. Mobley's statements that employees would be disciplined and reprimanded for missing work and that these types of statements continued even after Defendant terminated Ms. Mobley. Ms. Howell conceded that neither she nor her fellow RCs were disciplined for their complaints although they were told that they needed to be "more responsible" and respect their supervisors. (Tr. 397-98.) They were also told that it was their fault Ms. Mobley was terminated and they "needed to stop making petulant complaints and acting like children[.]" *Id.*

Because Ms. Howell was unavailable to testify, a portion of her deposition testimony was admitted over Defendant's objection based on the court's ruling that Ms. Howell's testimony was relevant to Defendant's retaliatory intent. Defendant argues this

18

testimony was not probative, lacked foundation, and was especially prejudicial as Ms.
Howell was not subject to cross-examination at trial, although Defendant's counsel
questioned her at deposition and cross-designated portions of her deposition to be read to
the jury.

> Prior acts of an employer are admissible for the purpose of establishing or
> negating discriminatory intent because "discrimination analysis must
> concentrate not on individual incidents, but on the overall scenario .
> . . . What may appear to be a legitimate justification for a single incident of
> alleged harassment may look pretextual when viewed in the context of
> several other related incidents."

*Solomon v. Uniondale Union Free Sch. Dist.*, 2007 WL 608137, at \*4 (E.D.N.Y. Feb. 16,
2007) (alteration in original) (quoting *Raniola*, 243 F.3d at 622). Ms. Howell
corroborated Plaintiff's claim that Defendant's employees were expected to work when
they were sick and faced disciplinary action if they failed to do so. The prejudicial impact
of this testimony was minimal as Defendant's own employee, Mr. Lacharite, testified that
this was also his understanding. The probative value of this evidence substantially
outweighed any unfair prejudice as it went to the heart of Plaintiff's VOSHA and VESTA
claims.

Defendant seeks a new trial with regard to Ms. Grangent's testimony about food
quality, mold, student behavioral issues, and the discouragement of reports to the DOL,
which Defendant argues are "far afield of the issues at trial" and were inadmissible
propensity evidence under Federal Rule of Evidence 404(b). (Doc. 135 at 46.) Ms.
Grangent's testimony, however, was probative of the context in which Plaintiff's alleged
protected activity took place and admissible on the issue of retaliatory intent. It was
limited in scope, and the court prohibited Plaintiff from expanding this evidence further.
(Tr. 360-65.)

In any event, Ms. Grangent's testimony did not solely favor Plaintiff as she
admitted that, although she received a variety of employee complaints, none of those
individuals were terminated for making them. Defendant argued to the jury that the lack
of cleaning supplies on a single occasion or working while sick were *de minimis* events

that did not warrant a finding of liability or damages. Plaintiff was entitled to demonstrate that these issues were part of a broader pattern and culture of disregard for employee and student well-being and unsanitary conditions. *See United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (holding other acts are admissible if they "arose out of the same transaction or series of transactions as the [claims] . . . or if it is necessary to complete the story of the [claims] on trial") (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).

The challenged testimony was also admissible with regard to Plaintiff's punitive damages claim, for which a jury may consider whether "the conduct involved repeated actions or was an isolated incident." *Shahi*, 2008 VT 25, ¶ 26, 183 Vt. at 334, 949 A.2d at 1034. Evidence that Defendant "had committed similar acts in the past against others" was therefore relevant. *Carpentier*, 2013 VT 91, ¶¶ 17, 23, 195 Vt. at 59-60, 62, 86 A.3d at 1012, 1014; *see also Sweet v. Roy*, 801 A.2d 694, 710 (Vt. 2002) (holding other bad act evidence "was admissible on whether to award punitive damages and on the amount of any punitive damages") (citing *Devine v. Rand*, 38 Vt. 621, 626-27 (1866)); *accord BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996) (holding "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support" to finding of reprehensibility); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) (noting that "the existence and frequency of similar past conduct" is relevant to punitive damages).

In closing arguments, Plaintiff's counsel referred to Ms. Howell's and Ms. Grangent's testimony only in the context of retaliatory animus and punitive damages. Because the challenged evidence was properly admitted, relevant, and not unfairly prejudicial, its presentation to the jury does not merit a new trial.

### 3. Whether An Improper Closing Argument Warrants a New Trial.

Defendant contends that a new trial is warranted because Plaintiff's counsel was allowed to propose a punitive damages amount for the first time in rebuttal. At trial, Defendant objected because it would not have an opportunity to respond to this amount.

The court allowed Plaintiff's counsel to request a specific punitive damages amount and instructed the jury that "the [D]efendant had no opportunity to address it." (Tr. 876.) Defendant declined the opportunity to offer a sur-rebuttal argument. (Tr. 882.) In its own closing argument, Defendant told the jury Plaintiff spent "a lot of time talking about punitive damages. Big dollar signs[,]" and that Plaintiff was asking for Defendant to be "punished by paying [Plaintiff] a massive windfall . . . [which] doesn't even merit any consideration." (Tr. 864-65.)

"[W]hen the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992) (citations omitted). "Obviously not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." *Id.* (citing *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)). In the context of the entire trial, some issues can be "dealt with by the trial court's rulings and curative instructions." *Id.* But "the bounds of counsel's advocacy are circumscribed by considerations of the prejudice it might engender." *Id.* at 539 (collecting cases).

In general, rebuttal is "an opportunity to respond to the defense's arguments in summation[.]" *United States v. Faisal*, 282 F. App'x 849, 850 (2d Cir. 2008) (citing *United States v. Rubinson*, 543 F.2d 951, 966 (2d Cir. 1976)). Plaintiff's claim for punitive damages was asserted throughout the trial and in his initial summation, although no dollar amount was requested until his rebuttal. The Second Circuit "has not adopted a ban on suggestions of damage amounts[,]" although it has "expressed concern that lawyers may influence juries unduly when they mention particular damage awards." *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997) (citing *Mileski v. Long Island Rail Road Co.*, 499 F.2d 1169, 1172-74 (2d Cir.1974)). The concern is that "[a] jury with little or no experience in such matters, rather than rely upon its own estimates and reasoning, may give undue weight to the figures advanced by plaintiff's counsel, particularly if he conveys the impression (as frequently happens) that he speaks on the basis of extensive trial experience." *Mileski*, 499 F.2d at 1172.

21

Plaintiff's counsel stated:

> 3-1/2 million. That's what Mr. Cole requests in this case for punitive
> damages. Is that enough to deter a company like [Defendant]? I don't
> know. You use your own judgment. Maybe it's too much. I don't know.
> Mr. Cole requests 3-1/2 million in order to deter this conduct. Please feel
> free to make your own determination on that and the other damages.

(Tr. 877.)

While the court perhaps should have "specifically caution[ed] the jury that the dollar figures advanced by counsel do not constitute evidence but merely represent argument which the jury is free to disregard in its deliberations[,]" *Mileski*, 499 F.2d at 1174, Defendant did not request this type of curative instruction, and the court's contemporaneous instruction that Defendant had no opportunity to respond to this amount alerted the jury that Plaintiff's figure was merely a suggestion. Defendant proposed no further curative instructions and was offered an opportunity for sur-rebuttal but declined it. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1282 (11th Cir. 2008) (holding defendant was not prejudiced where plaintiff "did not argue punitive damages in his first closing argument but raised the issue in rebuttal" because defendant "could have requested a sur[-]rebuttal, but . . . failed to request an opportunity to respond on this issue"). The court's jury instructions made clear that counsel's arguments and statements were not evidence. Against this backdrop, Plaintiff's counsel's "summation was not so outrageous, [n]or [was] the [court's] failure to [further] caution the jury with respect to it so fundamental an error, as to mandate [a new trial]." *Mileski*, 499 F.2d at 1174.

### 4.     Whether the Jury's Award of Emotional Damages Was Excessive.

Pursuant to Fed. R. Civ. P. 59, the court has discretion to "overturn[] verdicts for excessiveness and order[] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Lore*, 670 F.3d at 177 (alterations in original) (internal quotation marks omitted) (quoting *Gasperini*, 518 U.S. at 433).

> In considering motions for a new trial and/or remittitur, "[t]he role of the
> district court is to determine whether the jury's verdict is within the

22

confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered."

*Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (alteration in original) (quoting *Gasperini*, 518 U.S. at 435).

The jury awarded $75,000 in emotional distress damages, which Defendant argues were "garden variety," meaning "the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony." *Sooroojballie v. Port Auth. of New York & New Jersey*, 816 F. App'x 536, 546 (2d Cir. 2020) (citation omitted). Citing non-controlling decisions, Defendant asserts "garden variety" emotional distress claims merit awards of $35,000 or less absent exceptional circumstances. *See, e.g.*, *Najnin v. Dollar Mountain, Inc.*, 2015 WL 6125436, at *3 (S.D.N.Y. Sept. 25, 2015) ("'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards. Cases with evidence of debilitating and permanent alterations in lifestyle may merit larger awards.") (citation omitted).

While Plaintiff's emotional distress claims are indisputably of the "garden variety," the cited cases are not dispositive. The Second Circuit has affirmed awards of $125,000 for emotional damages "where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress[.]" *Lore*, 670 F.3d at 177 (internal quotation marks and citations omitted) (collecting cases).

Moreover, Vermont law is relevant to the excessiveness determination. *See Stampf*, 761 F.3d at 204 (quoting *Gasperini*, 518 U.S. at 435) (holding district courts must "determine whether the jury's verdict is within the confines set by state law"). Under Vermont law, "an award of damages where exact computation is impossible" must be upheld "[u]nless grossly excessive[.]" *Lent*, 470 A.2d at 1172. The Vermont Supreme

23

Court has held that it is not possible to place an exact "monetary value on a person's sense of dignity[.]" *In re Est. of Peters*, 765 A.2d 468, 477 (Vt. 2000). "Calculating damages is the jury's duty," and considering the evidence, "the size of the verdict alone does not show that the award was entirely excessive." *Id.* at 478 (internal quotation marks and citations omitted). Although the jury's award of emotional damages was substantial, it was not so excessive that it warrants a new trial.

### 5. Whether The Jury's Awards of Back Pay and Front Pay Were Excessive and Unsupported By the Evidence at Trial.

Defendant gains greater traction with its argument that the jury's awards of back pay and front pay were excessive and unsupported by the evidence at trial. The jury awarded Plaintiff back pay of $55,305 and front pay of $85,638, for a total of $140,943. Plaintiff had requested a total of $136,716.

In evaluating whether compensatory damages are excessive under Vermont law, the court "must consider the evidence in the light most favorable to the damages found by the jury and uphold the verdict if there was evidence reasonably supporting it." *Sweet*, 801 A.2d at 713. "The general rule for determining damages is that the jury should estimate the amount within reasonable limits based upon the evidence before it. Thus, if there is evidence from which an estimation may be made with reasonable certainty, a jury has the authority to make an assessment." *In re Grievance of Brown*, 2004 VT 109, ¶ 26, 177 Vt. 365, 375, 865 A.2d 402, 410 (internal quotation marks and citations omitted) (quoting *Benoir v. Ethan Allen, Inc.*, 514 A.2d 716, 719 (Vt. 1986)). "When front pay is allowed, the damages must be limited to a reasonable period of time, and the amount must not be speculative." *Haynes v. Golub Corp.*, 692 A.2d 377, 383 (Vt. 1997) (citations omitted).

An award of back pay and front pay may be "too speculative because it exceed[s] the amount claimed by plaintiff[.]" *Id.* In this case, the award of back pay and front pay exceeded the amount claimed by Plaintiff and cannot be explained by an adverse tax offset or Plaintiff's *post hoc* justifications. For example, Plaintiff suggests that the jury could have concluded that his salary would have risen higher than the 2.5% estimated by

his expert witness because his expert witness testified his estimate was conservative. Plaintiff further argues the jury could have decided that he would have worked his way up to a higher wage because a document in evidence listed a maximum salary for his position higher than his actual salary. Alternatively, the jury could have decided Plaintiff would have been promoted to a position with higher pay based on testimony from Defendant's expert that another employee in his position had been promoted. The mere speculative possibility of a higher salary or promotion, however, does not provide "reasonable certainty" of the dollar amount awarded. *In re Grievance of Brown*, 2004 VT 109, ¶ 26, 177 Vt. at 375, 865 A.2d at 410 (internal quotation marks and citations omitted) (quoting *Benoir*, 514 A.2d at 719).

Defendant contends it was not reasonable for the jury to award front pay until Plaintiff reached the age of seventy in 2033 because turnover of RCs at NJCC was rampant, Plaintiff worked for Defendant for only a short while and was still in probationary status, Plaintiff asked for reassignment to a lower-paying position, and Plaintiff has never held long-term employment. *See Havill v. Woodstock Soapstone Co.*, 2004 VT 73, ¶ 29, 177 Vt. 297, 309, 865 A.2d 335, 344 ("[T]he length of employment prior to termination is a factor bearing on the determination that a front pay damage award is reasonable and not too speculative."). Defendant proffered evidence that prior to his employment at NJCC, Plaintiff changed jobs on average once every three years. After his termination, he changed jobs on average every three months.[6]

In addition, Defendant elicited evidence that Plaintiff's expert witness had not reviewed Defendant's contract to operate NJCC and therefore made assumptions about

---

[6] As Defendant points out, there was also evidence that Plaintiff failed to mitigate his damages, including leaving two managerial positions with allegedly comparable pay and benefits. *See Bergerson v. New York State Off. of Mental Health, Cent. New York Psychiatric Ctr.*, 526 F. App'x 109, 111 (2d Cir. 2013) ("A plaintiff who, for personal reasons, resigns from or declines a job substantially equivalent to the one [he or] she was denied has not adequately mitigated damages. But an employee need not go into another line of work, accept a demotion, or take a demeaning position, and a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment[.]") (internal quotation marks and citations omitted).

raises and the duration of Plaintiff's employment that were inconsistent with that contract.[7] Plaintiff counters it was reasonable for the jury to conclude he would stay at NJCC until age seventy because his RC position was the best-paying job he had ever had, was within his chosen profession and consistent with his educational background, and he had no incentive to leave.

The court agrees with Defendant that no rational view of the evidence supports a conclusion that Plaintiff would have worked at NJCC until he was seventy. He was sufficiently dissatisfied with his role as RC to ask for reassignment prior to his termination. Moreover, nothing in his work history either before or after his employment with Defendant supported a conclusion that he would have remained in the same position throughout his career. There was also evidence that Plaintiff failed to mitigate his damages by resigning from two positions that would have reduced his damages. More importantly, the awards of back pay and front pay awarded were not supported by the evidence and were more than Plaintiff requested, which, alone, reflects a "seriously erroneous result[.]" *Crawford*, 815 F.3d at 128 (quoting *Nimely*, 414 F.3d at 392). Although the court could order remittitur rather than a new trial on the issues of back pay and front pay, the jury's grossly excessive punitive damages award renders remittitur inappropriate.

> ### 6.    Whether the Jury's Award of Punitive Damages Was Excessive.

A punitive damages verdict may be set aside "only if it is 'manifestly and grossly excessive.'" *Sweet*, 801 A.2d at 715 (quoting *Crump v. P & C Food Mkts., Inc.*, 576 A.2d 441, 450 (Vt. 1990)). "Grossly excessive" is the same language used by the Supreme Court to evaluate whether punitive damages are so excessive that they violate the Due Process Clause. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."); *Gore*, 517 U.S. at 568

---

[7] Defendant's contract to run NJCC was guaranteed for only three years with a three-year renewal period. After five years, DOL was required to put the contract out to bid.

("Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."). The Vermont Supreme Court has applied the Supreme Court's framework in reviewing punitive damages awards. *See Carpentier*, 2013 VT 91, ¶¶ 19-25, 195 Vt. at 60-63, 86 A.3d at 1013-14; *but see Sweet*, 801 A.2d at 446-47 (maintaining the Vermont standard is more deferential to the jury).

Three guideposts assist in the determination of whether a punitive damages award is grossly excessive: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. As to reprehensibility, the court must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419; accord *Shahi*, 2008 VT 25, ¶ 26, 183 Vt. at 334-35, 949 A.2d at 1034.

In this case, Defendant harmed Plaintiff economically, not physically, although its conduct evinced a disregard for the health and safety of its employees and students. There was also evidence of a corporate culture of suppressing legitimate complaints, and thus sufficient reprehensibility to support a punitive damages award.

On the other hand, Defendant's conduct was limited in scope and duration, Plaintiff was a probationary employee, and Defendant was in the process of trying to re-establish higher standards at a facility which it recently took over and conceded was a "mess." (Tr. 645.) Defendant pointed out that it was Plaintiff's responsibility as an RC to ensure there were sufficient cleaning supplies and further argued Plaintiff's conduct in

leaving his shift and a dormitory of students unattended at a time when NJCC was understaffed posed its own safety risks. In addition, although Plaintiff proffered sufficient evidence of malice to submit the question to the jury, Defendant countered with evidence of good faith mistakes in Plaintiff's termination notice coupled with evidence that Plaintiff's employment status was at will.

Defendant presented evidence of non-retaliatory reasons for Plaintiff's termination, including abandonment of his shift and prior discipline while NJCC was operated by Chugach. It proffered evidence that notwithstanding claims about a culture of suppressing complaints, there was no evidence that other employees had been disciplined or terminated on that basis. Finally, Defendant presented evidence that Ms. Grangent, Plaintiff's primary witness against Defendant, may have been motivated to testify falsely because Defendant terminated her employment.

On balance, Defendant's conduct does not support the amount of punitive damages awarded, which reflects a high degree of reprehensibility and virtually no mitigating circumstances. As media outlets reported, this was one of the largest employment verdicts in Vermont history, *see* Doc. 135 at 60 (collecting news articles), even though the facts and circumstances of this case did not shock the conscience or fall so far outside accepted norms that they mandated severe punishment and substantial deterrence.

The ratio of punitive to compensatory damages in this case, 13.9 to 1, also supports a conclusion that the jury's punitive damages award was excessive. While there is no "bright-line ratio which a punitive damages award cannot exceed . . . in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. Vermont law does not "impos[e] a ratio requirement[,]" in part because to do so "would improperly hamper the punitive function of the award[,]" *Pezzano v. Bonneau*, 329 A.2d 659, 661 (Vt. 1974); however, the Vermont Supreme Court has considered the ratio to be a relevant metric in determining whether punitive damages are excessive. *See Carpentier*, 2013 VT 91, ¶ 24, 195 Vt. at 62, 86 A.3d at 1014 (considering ratio between

compensatory and punitive damages "to the extent . . . relevant"); *Appropriate Tech.*
*Corp.*, 508 A.2d at 727 (holding that "[p]unitive damages need not bear any relationship
to the underlying compensatory damage award" but the ratio of compensatory damages to
punitive damages is "[n]evertheless" relevant in determining whether punitive damages
award should be vacated on appeal). "Single-digit multipliers are more likely to comport
with due process," although:

> ratios greater than [single digits] may comport with due process where a
> particularly egregious act has resulted in only a small amount of economic
> damages. . . . The converse is also true, however. When compensatory
> damages are substantial, then a lesser ratio, perhaps only equal to
> compensatory damages, can reach the outermost limit of the due process
> guarantee. The precise award in any case, of course, must be based upon
> the facts and circumstances of the defendant's conduct and the harm to the
> plaintiff.

*Campbell*, 538 U.S. at 425 (internal quotation marks and citations omitted).

In cases in which the Vermont Supreme Court has upheld ratios greater than a
single digit, the compensatory damages have been relatively small and the conduct
"particularly egregious[.]" *Id.* (internal quotation marks omitted). For example, in *Sweet*
*v. Roy*, the Vermont Supreme Court upheld a 10-to-1 ratio where compensatory damages
were $10,000. 173 A.2d at 715. In *Sweet*, the jury found defendants had attempted "to
evict plaintiff by force or other self-help means" and there was evidence that defendants
were engaged in a longstanding and ongoing campaign of self-help evictions in the trailer
park they owned, which included throwing rocks through trailer doors, pouring water in
fuel lines, breaking windows, and cutting electrical lines. *Id.* at 699-700. The Vermont
Supreme Court found the jury "faced a strong need to fashion a punitive damage award
that would deter defendants' ongoing illegal conduct and scheme and prevent further
harm to park residents. In addressing this need, it had compelling evidence that a smaller
punitive damage award, levied in 1986, had not deterred the misconduct." *Id.* at 715.

The only case Plaintiff cited in which the Vermont Supreme Court upheld a ratio
greater than 13.9-to-1 is *Pezzano v. Bonneau*, in which the ratio was 25 to 1. 329 A.2d at
660. However, there, the compensatory damages were only $300 and, in addition to

maliciously converting the plaintiff's car, the defendant falsely told police that the plaintiff stole the car and was dealing drugs. *Id.*

In this case, the amount of compensatory damages was "substantial," but unsupported by the evidence and in excess of the amount Plaintiff requested. This alone suggests the jury made decisions based on factors external to the evidence presented. In turn, Defendant's reprehensible conduct was limited in time and scope and was not apparently part of a broader context of disciplining or terminating employees with retaliatory intent. *Campbell*, 538 U.S. at 425. The jury was not presented with any evidence that prior adverse verdicts had failed to deter Defendant's conduct.

The third factor is "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418. The parties both cite what they consider comparable cases, primarily in federal courts, but "on the issue of excessiveness, comparing punitive damage awards in other cases where employers were found liable for discrimination and/or retaliation, is of limited utility because a wide range of awards have been upheld." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 589-90 (S.D.N.Y. 2010) (citing *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 77 (E.D.N.Y. 2002) (collecting cases upholding punitive awards between $10,000 and $1.25 million) (alteration omitted)).

As Plaintiff observes, Defendant could have proffered evidence of its financial status and chose not to do so. This lack of evidence, however, only goes so far. It does not mean the jury's punitive damages award is not cabined by any restraints. A relevant metric in this case is the civil penalties authorized by VOSHA and VESTA. *See Campbell*, 538 U.S. at 418. An employer who violates VESTA "shall be fined not more than $5,000.00." 21 V.S.A. § 345; *see also* 21 V.S.A. § 483(m) ("An employer who violates [VESTA] shall be subject to the penalty provisions of [21 V.S.A. § 345]."); Vt. Admin. Code 13-5-13(a) ("An employer who violates [VESTA] shall be fined not more than $5,000.00 per violation."). An employer who "willfully or repeatedly violates" VOSHA "may be assessed a civil penalty of not more than $126,749.00[.]" 21 V.S.A. § 210. The jury's punitive damages award dwarfs these civil penalties which reflect the

Vermont Legislature's determination of an appropriate punishment.

"Punitive-damage awards are subject to constitutional scrutiny because due process demands 'that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'" *Shahi*, 2008 VT 25, ¶ 25, 183 Vt. at 334, 949 A.2d at 1033 (quoting *Gore*, 517 U.S. at 574). Here, the jury's award of $3 million in punitive damages was so "manifestly and grossly excessive[,]" *Sweet*, 801 A.2d at 715 (internal quotation marks omitted) (quoting *Crump*, 576 A.2d at 450), under both Vermont law and the Due Process Clause, that it must be set aside. Although the court is reluctant to intrude upon the province of the jury, it must do so when necessary to prevent "a miscarriage of justice" that would undermine confidence in the courts. *Crawford*, 815 F.3d at 128 (quoting *Nimely*, 414 F.3d at 392). The jury's award of punitive damages was beyond "the outermost limit of the due process guarantee[,]" *Campbell*, 538 U.S. at 425, and Defendant is therefore entitled to a new trial on the issue of punitive damages.

### 7.   Whether the Court Should Order Remittitur.

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995) (citing *Phelan v. Loc. 305 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus.*, 973 F.2d 1050, 1064 (2d Cir. 1992)). "[W]hether a new trial or remittitur should be ordered" is to be determined "by reference to federal standards developed under Rule 59[.]" *Stampf*, 761 F.3d at 204 (quoting *Gasperini*, 518 U.S. at 435).

"A remittitur should be granted only where the trial has been free of prejudicial error." *Ramirez*, 112 F.3d at 40 (citing *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027-28 (2d Cir. 1991)). "If, instead, the record establishes that the jury's verdict on damages was not only excessive but was also infected by fundamental error, remittitur is improper" and the court should order "a new trial on damages." *Id.* In some cases, "the size of a jury's verdict may be so excessive as

to be 'inherently indicative of passion or prejudice' and to require a new trial." *Id.* at 40-41 (citing *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 603 (5th Cir. 1988)).

"The cases in which the jury's award is seen to reflect prejudice, however, are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court"; for example, where the "district court ordered $4.35 million remittitur after jury awarded $5 million" or where the "district court ordered $1.65 million remittitur after jury awarded $1.9 million[.]" *Id.* at 41 (citing *Auster Oil & Gas, Inc.*, 835 F.2d at 603; *Wells v. Dallas Indep. Sch. Dist.*, 793 F.2d 679, 683-84 (5th Cir. 1986)).

Because of the grossly excessive award of punitive damages in this case, coupled with awards of back pay and front pay unsupported by the evidence, any remittitur ordered by the court may be "totally out of proportion to the damages allowed[.]" *Id.* Remittitur is thus inappropriate, and the court must hold a new trial.

While Rule 59 "permits partial retrial of distinct issues, . . . the trial court must examine whether a jury's award of damages and its finding of liability are sufficiently separate to allow a partial new trial[.]" *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 906 (2d Cir. 1982) (citing *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.")). Liability in this case is sufficiently distinct from damages that a new trial limited to the issue of appropriate damages would not prejudice either party.[8]

For the foregoing reason, the court DENIES IN PART and GRANTS IN PART Defendant's motion for a new trial and ORDERS a new trial on damages.

---

[8] While the jury's award of emotional distress damages is not itself excessive, the issue of emotional damages is not "sufficiently separate" from other damages "to allow a partial new trial" as to front pay, back pay, and punitive damages but not emotional distress damages. *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 906 (2d Cir. 1982) (citing *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931)).

## CONCLUSION

For the foregoing reasons, Defendant's renewed motion for judgment as a matter of law is DENIED and Defendant's motion for a new trial is DENIED IN PART and GRANTED IN PART. (Doc. 131.) The court hereby ORDERS a new trial on damages. SO ORDERED.

Dated at Burlington, in the District of Vermont, this _22ⁿᵈ_ day of March, 2022.

Christina Reiss, District Judge
United States District Court